WESTERN COMPANY OF NORTH AMERICA, J & L Tank, Inc., Grayco Electrical, Inc. and Aggregate Plant Products Company, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 81–1397.

United States Court of Appeals, Fifth Circuit.

March 4, 1983.

Rehearing Denied May 5, 1983.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Richard W. Perkins, Michael J. Roach, Attys., Chief Appellate Section, Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

R. Gordon Appleman, Fort Worth, Tex., for Western Co. of North America.

Before THORNBERRY, JOHNSON and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge:

Western Company of North America won a refund of $208,008.73 in special fuels and highway use excise taxes assessed on certain of its vehicles for the taxable period 1971 through 1977. The Government appeals, contending that the district court erred in refusing to apply a regulation promulgated in 1977 to the determination of Western's 1977 tax liability, and in refusing to hold a hearing on a post-verdict dispute regarding the taxability of certain hybrid vehicles. We agree that the district court erred in its apparent determination that the 1977 regulation was invalid because a different, prior interpretation had attained the force of law, and remand for entry of judgment in favor of the Government for the taxing period 1977. We find no error in the district court's decision to resolve the post-verdict dispute on the record developed at trial.

## I.

Section 4041(a) of the Internal Revenue Code of 1954 imposes a special fuel excise tax of four cents per gallon on any liquid sold or used as fuel in a "diesel-powered highway vehicle." 26 U.S.C. § 4041(a). Section 4481(a) of the Code imposes a highway use excise tax on any "highway motor vehicle" with a gross weight of more than 26,000 pounds. The dispute between Western Company and the United States centers on whether certain specialized equipment-bearing trucks and trailer chassis are "highway vehicles," and thus taxable, within the meaning of sections 4041(a) and 4481(a).

Western is a corporation in the business of providing specialized services needed in drilling and operating oil and gas wells. Western's services consist primarily of cementing,[1] acidizing,[2] and fracturing[3] wells at the well sites. These functions are performed by specialized cement, acid and sand-and-water high pressure pumping machines, known as "slurrymasters," "acidmasters," and "fracmasters." The pumping units are serviced by additional specialized equipment designed to blend the cement and sand mixtures ("slurry mixers" and "blenders"), to transport the necessary dry cement, acid and sand, to pneumatically transfer these supplies from transports to storage units and to transport and unload high pressure pipe at the job sites.

The nature of Western's work demands that its equipment be mobile. The machinery is kept at district offices and dispatched, as needed, to well servicing jobs one hundred miles or more from the offices. The equipment stays on the job site for a few hours or days and is then moved onto another job or returned to the district office. To facilitate movement of the equipment, Western mounts each unit, by welding or bolting, on a truck chassis or trailer. Special capabilities are required of these equipment-bearing chassis and trailers, as well as of Western's various tractors, transports, and other trucks, by virtue of the geographic dispersion of Western's customers and the relative inaccessability of many of the well sites. About eighty percent of the average 21,841 miles annually logged by Western's service vehicles is over public highways. But many job sites are remotely situated, and can be reached only by traveling substantial distances over often rocky, muddy, uneven private roads. To meet these demands, Western's chassis and trailers are designed to be able both to travel public highways at sustained speeds with reasonable economy of operation, and to traverse difficult terrain and unimproved private roads.

The truck chassis and trailers are built by various manufacturers to Western's engineering specifications. Western's design incorporates the compromises necessary to satisfy the requisites of highway driving and off-road use. Most of Western's vehicles are equipped with a 16-speed Spencer transmission, providing high torque at low speeds, as well as the range necessary for highway operation. The vehicles' Michelin XYZ radial tires, while not providing the high traction and damage resistance of all-terrain tires designed for off-highway use, do provide a good service life on the highway and more traction than a normal highway tire in sand and loose soil, without the danger of failure due to overheating at sustained highway speeds posed by all-terrain tires. Other features, such as special

1. Cementing is a process of pumping a cement slurry at high pressure into the space between the well casing and the wall of the hole, thereby bonding the casing to the rock.

2. *Acidizing is a stimulation treatment applied to new or reworked wells after completion in a producing formation to increase the amount of oil or gas coming into the well. In acidizing, a solution of 15% hydrochloric acid is pumped into a well which has been completed in a limestone or dolomite reservoir. The acid dis-*solves part of the rock, thereby increasing its permeability and stimulating a greater flow of oil or gas into the well.

3. Fracturing is also a production enhancement treatment. It involves pumping water or another liquid mixed with sand into the well at pressures up to 20,000 pounds Psi. The pressure forces open fractures in the reservoir rocks thereby permitting a greater amount of oil or gas to reach the well.

frame supports and cross-member reinforcements, tandem front axles, and heavy-duty suspension systems, make the vehicles heavier and more expensive than similar commercial vehicles, thereby limiting their payload and increasing their operating costs as compared with exclusively highway vehicles. These features are, however, commonly found in heavy-duty highway trucks. Finally, the vehicles are in most cases engineered to incorporate the off-highway use features into designs acceptable for highway use without special permit. The delays and travel restrictions imposed on the movement of equipment with special permit are thereby avoided.

The issue of the taxability of Western's vehicles was tried to a jury. Western contended at trial that its vehicles were exempt from the special fuel and highway use excise taxes under a long-standing interpretation of the term "highway vehicle" as used in the manufacturer's excise tax, § 4061(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 4061(a). Under that interpretation, vehicles are not taxable if "primarily designed" or "predominantly adapted" for use as nonhighway vehicles, even though incidental highway use may occur. Treas.Reg. 46, § 316.50, T.D. 4998, 1940–2 C.B. 300; Rev.Rul. 57–440, 1957–2 C.B. 721; *modified* Treas.Reg. § 48.-4061(a)–1, T.D. 6648, 1963–1 C.B. 197. Western argued that judicial applications of the primary design standard to oil well servicing vehicles had consistently resulted in findings that the vehicles were not taxable because their design had been controlled by the demands of their specialized func-

tions and off-road usage, *see Big Three Industrial Case & Equipment Co. v. United States,* 329 F.Supp. 1273 (S.D.Tex.1971), *aff'd per curiam,* 459 F.2d 1042 (5th Cir. 1972); *Otis Engineering Corp. v. United States,* 376 F.Supp. 109 (N.D.Tex.1974); *compare Frank Hrubetz & Co. v. United States,* 412 F.Supp. 1033 (D.Or.1973), *aff'd on district court opinion,* 542 F.2d 512 (9th Cir.1976) *and Central Engineering Co. v. United States,* 306 F.Supp. 667 (E.D.Wis. 1969); *contra* Rev.Rul. 66–61, 1960–2 C.B. 250, *superseded* Rev.Rul. 80–353, 1980–2 C.B. 309.

The Government denied that Western's vehicles were exempt under that standard; in addition, it argued that a definition of "highway vehicle" contained in Treasury Regulations promulgated January 13, 1977, 42 Fed.Reg. 2672, T.D. 7461 1977–1 C.B. 317 *promulgating* Treas.Reg. on Excise Tax on Use of Certain Highway Motor Vehicles, § 41.4482(a)–1 (26 C.F.R.) and Treas.Reg. on Manufacturers and Retailers Excise Tax, § 48.4041–7 (26 C.F.R.) *incorporating by reference* Treas.Reg. on Manufacturers and Retailers Excise Tax, § 48.4061(a)–1 (26 C.F.R.), superseded all prior interpretations of the term "highway vehicle" and governed the tax status of Western's vehicles for at least the taxing period 1977.[4] The new regulation defined a "highway vehicle" as "any self-propelled vehicle, or any trailer or semi-trailer, designed to perform a function of transporting a load over public highways whether or not also designed to perform other functions," 26 C.F.R. § 48.-4061(a)–1(d).[5] Vehicles meeting that stan-

---

**4.** Under the amended regulations, the new definition was to apply retroactively, unless the taxpayer elected to apply the prior rules to an issue involving the definition of a "highway vehicle" for periods prior to 1977 and the prior rules "unequivocally resolve[d]" the dispute over the taxability of the vehicles. Treas.Reg. on Manufacturers and Retailers Excise Tax, § 48.4061(a)–1(d)(3), *post* note 5. At trial, the Government argued that the prior rules did not unequivocally resolve the dispute and requested application of the 1977 regulations to the entire period in question. The district court implicitly rejected the Government's nonelection argument by its application pre-1977 interpretations of "highway vehicle" to all periods

in issue. The Government does not appeal the question of the retroactive application of the regulations. Its challenge is restricted to the applicability of the 1977 regulations to the 1977 taxing period.

**5.** Treas.Reg. on Manufacturers and Retailers Excise Tax, § 48.4061(a)–1(d) states in full:

(d) Highway Vehicle. (1) Definition. For purposes of this subchapter, the term "highway vehicle" means any self-propelled vehicle, or any trailer or semitrailer, designed to perform a function of transporting a load over public highways, whether or not also designed to perform other functions, but does

dard might nonetheless be exempted from taxation if their chassis were designed to

not include a vehicle described in paragraph (d)(2) of this section. For purposes of this definition, a vehicle consists of a chassis, or a chassis and a body if the vehicle has a body, but does not include the vehicle's load. Therefore, in determining whether a vehicle is a "highway vehicle", it is immaterial that the vehicle is designed to perform a highway transportation function for only a particular kind of load, such as passengers, furnishings and personal effects (as in a house, office, or utility trailer), a special type of cargo, goods, supplies, or materials, or, except to the extent otherwise provided in paragraph (d)(2)(i) of this section, machinery or equipment specially designed to perform some off-highway task unrelated to highway transportation. In the case of specially designed machinery or equipment, it is also immaterial, except as provided in paragraph (d)(2)(i) of this section, that such machinery or equipment is permanently mounted on the vehicle. For purposes of paragraph (d) of this section, the term "transport" includes the term "tow", and the term "public highway" includes any road (whether a Federal highway, State highway, city street, or otherwise) in the United States which is not a private roadway. A vehicle which is not a highway vehicle within the meaning of this paragraph shall be treated as a nonhighway vehicle for purposes of this subchapter. Examples. of vehicles that are designed to perform a function of transporting a load over the public highways are passenger automobiles, motorcycles, buses, and highway-type trucks, truck tractors, trailers, and semi-trailers.

(2) Exceptions. (i) Certain specially designed mobile machinery for non-transportation functions. A self-propelled vehicle, or trailer, or semi-trailer, is not a highway vehicle if it (A) consists of a chassis to which there has been permanently mounted (by welding, bolting, riveting, or other means) machinery or equipment to perform a construction, manufacturing, processing, farming, mining, drilling, timbering, or operations similar to any one of the foregoing enumerated operations if the operation of the machinery or equipment is unrelated to transportation on or off the public highways, (B) the chassis has been specially designed to serve only as a mobile carriage and mount (and a power source, where applicable) for the particular machinery or equipment involved, whether or not such machinery or equipment is in operation, and (C) by reason of such special design, such chassis could not, without substantial structural modification, be used as a component of a vehicle designed to perform a function of transporting any load other than that particular machinery or equipment or similar machinery or equip-

carry specialized equipment and could not, without substantial structural modification,

ment requiring such a specially designed chassis.

(ii) Certain vehicles specially designed for off-highway transportation. A self-propelled vehicle, or a trailer or semi-trailer, is not a highway vehicle if it is (A) specially designed for the primary function of transporting a particular type of load other than over the public highway in connection with a construction, manufacturing, processing, farming, mining, drilling, timbering, or operation similar to any one of the foregoing enumerated operations, and (B) if by reason of such special design, the use of such vehicle to transport such load over the public highways is substantially limited or substantially impaired. For purposes of applying the rule of (B) of this subdivision, account may be taken of whether the vehicle may travel at regular highway speeds, requires a special permit for highway use, is overweight, overheight or overwidth for regular highway use, and any other relevant considerations. Solely for purposes of determinations under this paragraph (d)(2)(ii), where there is affixed to the vehicle equipment used for loading, unloading, storing, vending, handling, processing, preserving, or otherwise caring for a load transported by the vehicle over the public highways, the functions are related to the transportation of a load over the public highways even though such functions may be performed off the public highways.

(iii) Certain trailers and semi-trailers specially designed to perform non-transportation functions off the public highways. A trailer or semi-trailer is not a highway vehicle if it is specially designed to serve no purpose other than providing an enclosed stationary shelter for the carrying on of a function which is directly connected with and necessary [to, and at the off-highway site of, a con-] struction, manufacturing, processing, mining, drilling, farming, timbering, or operation similar to any one of the foregoing enumerated operations such as a trailer specially designed to serve as an office for such an operation.

(3) Optional application. For purposes of this subchapter, if any rules existing immediately prior to January 13, 1977 would, if applicable, unequivocally resolve an issue involving the definition of a highway vehicle with respect to a period prior to such date, at the option of the taxpayer, such rules existing prior to such date shall be applied to resolve the issue for all periods prior to such date, and the rules of paragraph (d)(1) and (2) of this section, which define the term "highway vehicle", shall not apply with respect to such issue for all periods prior to such date.

be used in another function, Treas.Reg. § 48.4061(a)–1(d)(i), or if their chassis were specially designed for an off-highway transportation function and that special design substantially limited or impaired public highway use, Treas.Reg. § 48.4061(a)–1(d)(ii). The Government claimed that Western's vehicles fell within the 1977 regulation's definition of highway vehicle, and qualified under neither exception.

Western countered by claiming that the 1977 regulation was invalid because the long-standing judicial and administrative interpretation of the term "highway vehicle" under the narrower "primary design" test had attained the force of law through implicit congressional approval by amendments and re-enactments of the underlying statutes. Finally, Western rounded out its position by claiming that even if the new regulation applied, its vehicles qualified under two of the exemptions from taxation set out in the new regulation.

The district court wisely refrained from resolving this dispute before sending the case to the jury. Instead, it asked that the jury apply each standard in turn to the nine categories of vehicles identified by the parties.[6] The jury decided in Special Interrogatory 1 that under the pre-1977 regulation test, all of Western's vehicles except the truck and trailer chassis bearing pressurized pumping and mixing equipment were taxable. In Special Interrogatory 2, it found all vehicles to be taxable under the standards set out in the 1977 regulation. The district court, in an apparent but unstated determination that the 1977 regulation was invalid because the primary design test had, as Western contended, attained the force of law, entered judgment[7] refunding the excise tax paid on the specialized equipment-bearing vehicles for all taxing periods from 1971 through 1977.

After judgment was entered, the Government moved to amend it on the ground that about fifty of Western's specialized-equipment bearing vehicles were equipped with a fifth wheel, enabling them to be used to tow a trailer, and were thus more properly categorized as taxable trailers.[8] The district court denied the Government's motion for a hearing on the matter and refused to reclassify the vehicles. The Government appeals the district court's denial of a hearing on the post-verdict dispute and its implicit invalidation of the 1977 regulation.

## II.

Western defends the district court's decision to apply the pre-1977 regulation primary design test to evaluation of its 1977 tax liability on a theory of preclusion of change in the administrative interpretation of "highway vehicle" by legislative approval of the pre-existing standard. The argument derives principally from the history of administrative and judicial interpretation of the term "highway vehicle" as used, not in the special fuels and highway use excise taxes in issue, but in the excise tax levied on manufacturers of motor vehicles, I.R.C. § 4061(a). Western claims that the manufacturers' excise tax, since the time of its original imposition by the 1917 Revenue Act, Pub.L. No. 65–50, § 600, 40 Stat. 316, consistently has been construed to reach only those vehicles designed primarily for highway transportation. Then, imputing

---

**6.** These categories were:
  (1) Body Load units (including Fracmasters, Blenders, Pressure Masters, Slurry Mixers, Slurry Accumixers, Acid Masters and Slurry Masters)
  (2) GP Tractor without Blower or Winch
  (3) GP Tractor with Blower or Winch
  (4) Trailer Mounted:
    (a) Equipment only: Fracmasters, Acid Masters, Acid Frac and Slurry Master
    (b) Cement Air Can & Sand Air Can
    (c) 5000 Gallon Acid Transport
    (d) Sand Dump Trailer

  (5) Sand Dump Truck
  (6) Line Truck

**7.** The trial court's judgment was entered in accordance with the jury's findings under Special Interrogatory 1.

**8.** $81,139.88 of the $208,008.73 judgment was attributable to the special fuels and highway use excise taxes paid on the disputed fifth wheel-equipped vehicles for the entire period in question.

awareness of the longstanding construction of the term under the manufacturers' excise tax to the Congress, Western asserts that the Congress' failure to modify that definition throughout the course of frequent amendments to and re-enactments of the excise tax acts constituted tacit approval of the interpretation, elevating it to the stature of positive law beyond all but legislative modification.

We differ with Western on two critical points. First, we emphasize that the question before us is of the validity of the 1977 regulation's definition of "highway vehicle" as applied under the special fuel and highway use excise taxes. Examination of the history of administrative and judicial interpretation of the term under the special fuels and highway use taxes discloses that a construction different from the primary design test prevailed under those statutes from the time of initial administrative consideration. Second, and more importantly, we find nothing in the sparse legislative history of the amendments and re-enactments of the three statutes to indicate that the Congress has considered and approved any particular interpretation of the term.

A.

The special fuels tax first appeared in 1951 as a "tax of two cents a gallon upon any liquid . . . sold . . . to an owner . . . of a diesel-powered highway vehicle for use as a fuel in such vehicle." Act of October 20, 1951, Pub.L. No. 82–183, Tit. IV § 441(a), 65 Stat. 523 (now I.R.C. § 4041(a)). It survives unchanged, save for a doubling in the tax rate, in the current version of the Code. I.R.C. § 4041(a).[9]

A definition of the term "highway vehicle" was included in the original regulations promulgated under the Act. Section 324.-10(c) of Regulations 119 stated:

**9.** I.R.C. § 4041(a) reads:

*Diesel fuel.*—There is hereby imposed a tax of 4 cents a gallon upon any liquid (other than any product taxable under section 4081)—

(1) sold by any person to an owner, lessee, or other operator of a diesel-powered high-

The term "diesel-powered highway vehicle" has reference to the type of vehicle and not to the use which is made of the vehicle. The term includes any vehicle powered or propelled by a diesel motor or engine and of the type which is capable of general use upon public highways, such as automobile trucks, busses, highway tractors, etc. The term does not, however, include equipment designed primarily for off-highway use, such as road graders, bulldozers, power shovels, earth movers, farm tractors, etc.

18 Fed.Reg. 63. Section 324.21(a) of Regulations 119 amplified the definitional distinctions.

The tax imposed by clause (1) of section 2450 of the Code applies to the sale of any taxable liquid to an owner, lessee, or other operator of a diesel-powered highway vehicle for use as a fuel in such a vehicle. It is immaterial whether the vehicle is actually employed in highway or off-highway use.

*Example.* The M Corporation is engaged in the construction of a power dam at a site removed from all public highways. Part of its construction equipment consists of diesel-powered shovels, bulldozers, and highway type dump trucks. The diesel fuel used in the highway type dump trucks is subject to tax even though such trucks are operated entirely within the bounds of the construction project. No tax is payable with respect to the diesel fuel used in the power shovels and bulldozers since none of this equipment is a vehicle which may be operated in general use over a public highway.

This interpretation drew the limits of the term "highway vehicle" to exclude only those vehicles the mobility of which was essential to their designed, off-highway functions; all others whose mobility was

way vehicle, for use as a fuel in such vehicle; or

(2) used by any person as a fuel in a diesel-powered highway vehicle unless there was a taxable sale of such liquid under paragraph (1).

compatible with public highway use were deemed taxable. The original regulation was made applicable to the Internal Revenue Code of 1954 by T.D. 6091, 1954–2 C.B. 47. It stood until replaced with an expanded version in 1960. Treas.Reg. § 48.4041–7(b), T.D. 6505, 1960–2 C.B. 291 stated:

(b) *Highway vehicle.*—The term "highway vehicle" has reference to the type of vehicle and not to the use which is made of the vehicle. The term means any motor vehicle, whether powered by diesel fuel or special motor fuel which is of the type used for transportation on the highways. It includes automobile trucks, buses, highway tractors, trolley buses, and other similar type vehicles. The term "highway vehicle" does not include any vehicle, which, although propelled by means of its own motor, is of a type not used for highway transportation, that is, of a type designed and manufactured for a purpose other than highway transportation. For example, vehicles such as earth movers, power shovels, trench diggers, and bulldozers, which are designed and manufactured as self-propelled units for "off-the-road" operations, are not highway vehicles. Neither are such motorized vehicles as road graders or rollers, which are designed and manufactured for construction or maintenance of roads, considered to be highway vehicles. The same is true of farm tractors, cotton pickers, and other motorized agricultural implements of a similar nature. However, the fact that equipment or machinery having a specialized use (as for example, an air compressor, crane, or specialized oil-field machinery) is mounted on a vehicle which, apart from such equipment or machinery, is of a type used for highway transportation will not remove such vehicle from classification as a highway vehicle.

The new version maintained the previously enunciated limits on the concept of "highway vehicle," and re-emphasized that the highway-worthiness of a vehicle's design, apart from its coordinate use to carry specialized equipment to off-highway destinations, rendered the vehicle subject to taxation. Intermittent amendments of the 1960 regulation reinforced the Service's stated conclusion that vehicles designed to function both on the highway and off attracted the special fuels tax. T.D. 6881 ¶ 2, 1966–1 C.B. 247 modified the regulation clearly to exclude from taxation fuel used by mobile, specialized equipment in the performance of its specialized function while immobilized; the point was illustrated by a hypothetical dealing with a derrick mast-carrying oil well servicing vehicle.[10] *Accord,* T.D. 7071,

---

10. T.D. 6881 ¶ 2, 1966–1 C.B. 247 states, in pertinent part:

(c) *Motor vehicles.*—(1) *In general.*—The term "motor vehicle" includes all types of vehicles propelled by motor which are designed for carrying loads from one place to another, regardless of the type of load or material carried and whether or not the vehicle is registered or required to be registered for highway use, such as forklift trucks used to carry loads at railroad stations, industrial plants, warehouses, etc. The term does not include farm tractors, trench diggers, power shovels, bulldozers, road graders or rollers, and similar equipment which does not carry a load; nor does it include any vehicle which moves exclusively on rails.

(2) *Temporary loss of classification as a motor vehicle.* (i) A vehicle on which equipment or machinery having a specialized use (as for example specialized oil-field machinery) is mounted and which (except for the provisions of this subparagraph) would be considered a motor vehicle under subparagraph (1) of this paragraph shall not be considered a motor vehicle during a period in which it does not have the essential characteristics of a motor vehicle. Such vehicle will be considered as not having the essential characteristics of a motor vehicle during the period the vehicle *is incapable of motion and* the equipment or machinery is performing the operation for which it is primarily adapted if—

(a) The primary use of such equipment or machinery is other than in connection with the loading, unloading, handling, preserving, or otherwise caring for any cargo transported on the vehicle,

(b) A "setting-up" process involving the expenditure of a substantial amount of time and effort is necessary to place the vehicle in such an immobilized and operative condition,

(c) After expending the necessary substantial time and effort the vehicle has the essential characteristics of an immobile piece of equipment or machinery designed for a specialized use, and

1970–2 C.B. 257. But the definition of "highway vehicle" set out by that regulation remained in significant aspects unchanged until promulgation of the 1977 version Western challenges.

A similar history, and interpretation, developed around the highway use tax. That tax was first levied in 1956 "on the use of any highway motor vehicle which . . . has a taxable gross weight of more than 26,000 pounds." Act of June 29, 1956, Tit. II § 206(a), 70 Stat. 389 (codified at I.R.C. § 4481(a)). The following section defined "highway motor vehicle" as "any motor vehicle which is a highway vehicle," *id.* (codified at I.R.C. § 4482(a)). Like the special

> (d) A "break-down" process involving a substantial amount of time and effort is required to restore the vehicle to a mobile condition.
>
> \*   \*   \*   \*   \*   \*
>
> (ii) The provisions of subdivision (i) of this subparagraph may be illustrated by the following example:
>
> *Example.* (a) The X Company which is engaged in the oil well servicing business uses a motor vehicle which is primarily adapted to oil well servicing. On June 1, 1965, X Company moves the motor vehicle from its permanent yard and travels to a wellhead which is to be serviced. At the wellhead, it is necessary to go through a "setting-up" process before the vehicle is capable of servicing the oil well. This process requires that a derrick-mast be erected and four guy wires attached to the top of the mast and four to the middle of the mast. The guy wires are then hooked to dead-man anchors which are set into the ground. Hydraulic jacks are use to remove all of the weight of the mast from the rear wheels of the vehicle and the front end of the vehicle is jacked up in order to insure the correct pitch of the mast. Outriggers are attached to the bottom of the mast and are laid on the ground to insure further stability. These operations are essential in order that the mast be secure and level over the wellhead and, when completed, the vehicle is incapable of movement. Three men perform this "setting-up" process in 2 hours and complete such process at noon on June 1, 1965, at which time the oil-well-servicing equipment is operative. The power used for operating the special equipment needed to service the oil well is obtained by means of a power transfer from the same motor which is used to propel the vehicle. The vehicle remains at the wellhead until June 10, 1965, at which time the servicing operations are completed. It takes three men 1½ hours to "break-down" the

fuels tax, the highway use levy has been substantially modified only by a doubling of the tax rate. Act of June 29, 1961, Pub.L. No. 87–61, Tit. II § 203(a), 75 Stat. 124. Its altogether unenlightening definition of "highway motor vehicle" has not been modified at all.[11]

The initial explication of its use of the term "highway motor vehicle" was set out in Treas.Reg. 41.4482(a)–1, T.D. 6216, 1956–2 C.B. 900–01.

> (c) *Highway vehicle.*—The term "highway motor vehicle" does not include any vehicle which, although propelled by means of its own motor, is of a type not used for highway transportation, that is,

> unit and to restore the vehicle to a mobile condition. The "break-down" process is completed at noon on such date.
>
> (b) It can be ascertained from the facts that it was necessary to expend a substantial amount of time and effort to place the vehicle in an immobilized condition and to place the equipment in an operative condition, and after expending such time and effort, the vehicle possessed the essential characteristics of an immobile piece of equipment designed for oil well servicing. Furthermore, the "break-down" process also involves substantial time and effort to return the vehicle to a mobile condition and to render the oil-well-servicing equipment inoperative. Accordingly, from noon on June 1, 1965, until noon on June 10, 1965, the vehicle is not considered a motor vehicle. At all other times, such vehicle is considered a motor vehicle.

11. The current version of I.R.C. §§ 4481(a) and 4482(a) states:

> § 4481. Imposition of tax
>
> (a) *Imposition of tax.*—A tax is hereby imposed on the use of any highway motor vehicle which (together with the semitrailers and trailers customarily used in connection with highway motor vehicles of the same type as such highway motor vehicle) has a taxable gross weight of more than 26,000 pounds, at the rate of $3.00 a year for each 1,000 pounds of taxable gross weight or fraction thereof. In the case of the taxable period beginning on July 1, 1984, and ending on September 30, 1984, the tax shall be at the rate of 75 cents for such period for each 1,000 pounds of taxable gross weight or fraction thereof.
>
> § 4482. Definitions
>
> (a) *Highway motor vehicle.*—For purposes of this subchapter, the term "highway motor vehicle" means any motor vehicle which is a highway vehicle.

of a type designed and manufactured for a purpose other than highway transportation. For example, vehicles such as earth movers, trench diggers, and bulldozers, which are designed and manufactured as self-propelled units for "off-the-road" operations, are not highway motor vehicles for purposes of the regulations in this part. Neither are such motorized vehicles as road graders or rollers, which are designed and manufactured for construction or maintenance of roads, considered to be highway motor vehicles. The same is true of farm tractors, cotton pickers, and other motorized agricultural implements of a similar nature. However, the fact that equipment or machinery having a specialized use (as for example, an air compressor, crane, or specialized oil-field machinery) is mounted on a vehicle which, apart from such equipment or machinery, is of a type used for highway transportation will not remove such vehicle from classification as a highway motor vehicle.

The interpretation was in all significant aspects identical to that developed under I.R.C. § 4041(a). It, too, excluded from the concept of "highway vehicle" those vehicles whose mobility was directly used in the performance of their designed, off-highway functions; it included vehicles designed to transport nonmobile special purpose equipment to off-highway work sites. Revenue Rulings applying the statute made clear the Service's position that taxable status extended to vehicles engineered especially to carry specialized equipment over the public highways from one off-highway job site to another. Rev.Rul. 69–340, 1961–1 C.B. 291 stated:

> Advice has been requested whether the motor vehicle described below constitutes a "highway motor vehicle" for purposes of the highway use tax imposed by section 4481 of the Internal Revenue Code of 1954.
>
> A certain self-propelled motor vehicle is designed and constructed to transport specialized oilfield equipment and machinery over the highway from one job site to another. The equipment and ma-

chinery are mounted on the vehicle so as to become integral parts thereof, but the mobility of the vehicle is not directly utilized in the performance of the function of the machinery and equipment. Because of the vehicle's specific design features and characteristics, if the equipment and machinery were removed the vehicle would not be suitable for any other highway transportation purpose. Nevertheless, providing mobility over the highway for the machinery and equipment is the most significant reason for construction of the entire vehicle as a piece of unitized equipment and this mobility clearly enhances the economic utility of the machinery and equipment thereon by making available a broader geographic use of the specialized equipment.

\*   \*   \*   \*   \*   \*

The broad intent of Congress in enacting the highway use tax on trucks was to tax vehicles exceeding a certain weight that are designed to transport a load over the highways. The regulation quoted above, read in its full context, carries into effect this intention of Congress by carving out from the tax only those vehicles clearly designed for off-highway use. The last sentence of the regulation sets forth the complementary rule where specialized equipment is mounted on a vehicle designed for highway purposes. Such equipment would be mounted on what might normally be considered the conventional type of truck chassis. The sentence is not meant to be, nor should it be, narrowly construed as excluding from the tax other vehicles not wholly conventional in style but which are nevertheless designed to transport a load, albeit specialized in nature, over the highways.

Accordingly, a vehicle otherwise classifiable as a "highway motor vehicle" for purposes of the tax imposed by section 4481 of the Code, is not removed from such classification merely because the specialized machinery and equipment that it is designed and constructed to transport are such an integral part of the vehicle that its removal would cause the

vehicle to be unsuitable for any other highway transportation purpose.

Therefore, it is held that the motor vehicle described in this Revenue Ruling is a "highway motor vehicle" for purposes of the tax imposed by section 4481 of the Code.

*Amplified,* Rev.Rul. 70–589, 1970–2 C.B. 273 (giving Rev.Rul. 69–340 prospective application); *declared obsolete,* Rev.Rul. 78–231, 1971 C.B. 450. Rev.Rul. 61–173, 1961–2 C.B. 207 accorded highway vehicle status to water trucks used in highway construction when traveling public highways from one construction site to another. Rev.Rul. 70–57, 1970–1 C.B. 241 found taxable a truck required to use the public highways to move from one off-highway job site to another, notwithstanding that the truck's principal use was in off-highway transportation operations, and that its excessive size and weight limited it to restricted use under special permits when operated on the public highways. The construction of the term "highway vehicle" under I.R.C. § 4481(a) as announced and implemented by the 1956 regulation and subsequent Revenue Rulings, like the parallel definition under I.R.C. § 4041(a), stood until the promulgation of the new 1977 regulation.

The few judicial interpretations of I.R.C. § 4482(a) as interpreted by the 1956 regulation, while giving the tax a somewhat narrower incidence than that urged by Rev. Ruls. 61–173 and 70–57, were by and large consistent with the Service's interpretation. *Carl Nelson Logging Co. v. United States,* 281 F.Supp. 671, 674 (D.Idaho 1967) held that outsized and excessively heavy logging trucks which traveled only private roads and a Forest Development road, and which by their designs were "economically, legally, and practically prohibitive for highway use" were not taxable. The decision accords with the 1956 regulation's exclusion of vehicles "designed and manufactured for a purpose other than highway transportation," Treas.Reg. § 41.4482(a)–1(c) (superseded 1977).

*Frank Rossi v. United States,* 220 F.Supp. 694 (D.Me.1963) and *Allied Bitumens, Inc.* *v. United States,* 353 F.Supp. 1128 (W.D.N. Y.1973) considered the taxable status of highway construction vehicles. In both cases, the vehicles were used almost exclusively in off-highway road construction, traveling on public roads only very limited distances, at slow speeds and under travel restrictions from one construction site to another. *Rossi* and *Allied* concluded, the former in reliance on the legislative history, the latter on *Rossi* and the 1956 regulation, that the Congress intended the tax to extend to vehicles used for highway transportation, but not to those used for construction, *Rossi* at 696; *Allied* at 1130. Both cases held the road construction vehicles exempt. *Rossi* did find it "also significant," *id.,* that the vehicles would not be subject to the manufacturers' excise tax under the primary design-incidental highway use standard; that observation did not, however, displace its interpretation of section 4482(a) in light of the legislative purpose as the basis of its ruling, but gave only support by analogy. *Rossi* and *Allied,* in analysis and result, are consistent with Treas. Reg. § 41.4482(a)–1(c)'s specific exemption of vehicles designed for construction and maintenance of roads.

The sole departure from the prevailing interpretation occurred in *Stafford Well Service, Inc. v. United States,* 340 F.Supp. 657 (D.Wyo.1972). The *Stafford* court held that seven derrick tractor trucks used to carry the derricks from one oil well site to another, which trucks together were driven only 3455 miles during the year in question and which operated on the public highways under travel restrictions, were not highway vehicles. In reaching this conclusion, it gave controlling force to *Rossi's* comparative reference to the manufacturers' excise tax; *Stafford* specifically rejected the Government's dual use interpretation of I.R.C. § 4482(a) in favor of the primary design-incidental use test of I.R.C. § 4041(a).

■ The interpretive history of I.R.C. §§ 4041(a) and 4482(a) shows that those statutes' use of the term "highway vehicle" was not consistently and continually inter-

preted by incorporation of I.R.C. § 4061(a)'s primary design-incidental use test. To the contrary, the Service established a record of long adherence to a contemporaneous construction taxing vehicles designed for and capable of carrying specialized loads both over public highways and off-road. That a similar examination of the interpretive history of the manufacturers' excise tax might support Western's claim of a sixty-year long consensus on construction of its reference to "highway vehicles" by the primary design-incidental use test is, standing alone, beside the point. Whatever the pattern of interpretation of I.R.C. § 4041(a), its standard did not achieve dominance in construction of I.R.C. §§ 4061(a) and 4482(a). Western's argument that the primary design standard became positive law by sheer longevity fails at the threshold for the fallacy in its premise.[12]

The consensus Western claims would, of course, attain significance if the Congress had at some time considered and approved the primary design standard as an accurate assessment of its intended incidence of taxation under all three statutes, see *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 102 S.Ct. 821, 830–31, 70 L.Ed.2d 792 (1982); *Rowan Co. v. United States,* 452 U.S. 247, 101 S.Ct. 2288, 2292–94, 68 L.Ed.2d 814 (1981); *Fribourg Navigation Co. v. Commissioner of Internal Revenue,* 383 U.S. 272, 86 S.Ct. 862, 869–70, 15 L.Ed.2d 751 (1966); *United States v. Leslie Salt Co.,* 350 U.S. 383, 76 S.Ct. 416, 421, 423–24, 100 L.Ed. 441 (1956); *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 75 S.Ct. 473, 477, 99 L.Ed. 483 (1955); *Helvering v. Reynolds,* 313 U.S. 428, 61 S.Ct. 971, 976–77, 85 L.Ed. 1438 (1941); *Association of American Railroads v. Interstate Commerce Commission,* 564 F.2d 486, 493–94 (D.C.Cir.1977). But Western conceded at oral argument that there is no such evidence of expressed congressional approval of that test under any of the statutes. The few brief references to "predominant" or "chief" use found in the legislative histories related either to distinction between vehicles designed for highway use and farm use, H.R. 1860, 1939–1 C.B. 728, 776; 1941–2 C.B. 413–440; S.R. 324, 1965–2 C.B. 676–677, or to classification of interchangeable chassis at the car tax rate or the truck tax rate, *id.* at 693. The discussions shed no light on the tax status of vehicles designed to transport equipment or machinery across both public highways and private property.

■ Western's argument that the primary design standard attained the effect of law by legislative re-enactment fails in light of the absence of express congressional approval of that standard, and in light of the Service's long adherence to a different interpretation of the statutes at issue.[13] We turn to Western's alternative arguments in support of the judgment.

### B.

Western has argued, almost in passing, that the jury's verdict under Special Inter-

---

**12.** Western has also suggested that this Court's use of the primary design test to resolve a manufacturers' excise tax question in *Big Three Indus. Gas & Equip. Co. v. United States,* 329 F.Supp. 1273 (S.D.Tex.1971), aff'd on district court opinion, 459 F.2d 1042 (5th Cir.1972) constituted a judicial interpretation of the meaning of the statutory term "highway vehicle," precluding administrative modification of the definition. Whatever the merits of Western's theory of preclusion, the argument is flawed by the erroneous assumption that the § 4061(a) definition of "highway vehicle" controls interpretations of that term under the special fuels and highway use taxes. Consideration of the validity of the 1977 regulation is properly conducted in the context of the construction given I.R.C. §§ 4041(a) and 4482(a). *Big Three,* like the administrative interpretations of § 4061(a), is not implicated in our decision.

**13.** Western also contends that, even if the primary design standard has not achieved the stature of positive law through congressional re-enactment of the underlying statutes, the 1977 regulation's inconsistency with that standard renders it invalid as an unreasonable interpretation of the special fuel and highway use taxes. But this argument also proceeds from the faulty premise that the primary design standard was, prior to promulgation of the 1977 regulations, consistently applied in interpretation of the incidence of the special fuels and highway use taxes. Our rejection of that premise dictates rejection of this attack on the validity of the 1977 regulation.

rogatory 2 is against the weight of the evidence. Western claims that its vehicles should have been found exempt under Treas.Reg. § 48.4061(a)–1(d)(2)(i) because the function of its vehicles' chassis can be changed only by substantial structural modification to the chassis, and under Treas. Reg. § 48.4061(a)–1(d)(2)(ii) because its highway use of the vehicles was substantially impaired by load limits, fuel economy, and other operating costs due to vehicular design.

■ The standard for appellate review of a jury's verdict is exacting. The verdict must be upheld unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary. If there is evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the jury function may not be invaded. *Fairley v. Am. Hoist & Derrick Co.,* 640 F.2d 679, 681 (5th Cir.1981); *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (*en banc*).

■ The trial record provided adequate support for the jury's verdict. The evidence indicated that Western used the same chassis to carry sand dumping bodies, pumping equipment, and blending equipment. It also indicated that the vehicles were capable of achieving reasonable fuel economy in highway travel at speeds approximately ten miles an hour below those of ordinary highway vehicles, and of carrying loads of acid, sand, and cement reduced by seven percent to one-third from those of ordinary vehicles. The jury could reasonably conclude on this proof that Western's vehicles met the criteria for neither exemption. Its verdict will not be disturbed.

### C.

Finally, Western argues that the "equality doctrine" of *International Business Ma-* *chines Corp. v. United States,* 343 F.2d 914, 170 Ct.Cl. 357 (1965), *cert. denied,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966) requires that the district court's decision be affirmed. *IBM* arose out of differential treatment of competitors both of which had sought private rulings from the IRS on the applicability of an excise tax to their computing devices. IBM's competitor, Remington Rand, secured a ruling exempting its computers from tax. Shortly thereafter, IBM requested a similar ruling. The IRS delayed action on IBM's request for two years, then refused its request *prospectively* and withdrew its prior private ruling to Remington. Its action effectively subjected IBM to tax during a period when its competitor was excused. The Court of Claims in a divided opinion held that under the circumstances of that case, the two competitors in the computer industry, one of which had received a ruling and the other of which had requested one promptly thereafter, were receiving different tax treatment under substantially the same facts and gave IBM the same relief as Remington had been granted.[14]

■ Western claims that its taxation under the special fuels and highway use taxes as interpreted by the 1977 regulation is similarly unfair because the manufacturer of its chassis secured a private letter ruling exempting those chassis from the manufacturers' excise tax under the same regulation. But we believe that *IBM* is not controlling here. Unlike IBM, which made every reasonable effort to obtain its own favorable private ruling, Western sought no ruling. To relieve Western of tax liability under the rubric of equal treatment would be tantamount to extending the private ruling granted its supplier to it. It is well established that a taxpayer must itself seek a ruling in order to claim the benefit of favorable treatment. It is not enough that a private ruling has been issued to one similarly situated. *Austin v. United States,* 611 F.2d 117, 120 (5th Cir.1980); *Rue R.*

---

**14.** The Court of Claims subsequently limited the *IBM* ruling to its facts. *Knetsch v. United States,* 348 F.2d 932, 940 n. 14, 172 Ct.Cl. 378 (1965), *cert. denied,* 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966).

*Elston Co. v. United States,* 532 F.2d 1176, 1181 (8th Cir.1976); *Shakespeare Co. v. United States,* 389 F.2d 772, 777, 182 Ct.Cl. 119 (1968).

### III.

 A post-verdict dispute arose under Special Interrogatory 1 over the proper classification of certain specialized equipment-bearing vehicles capable of towing other vehicles. The Government urged that they be categorized as taxable tractors; Western contended that they retained the characteristics of nontaxable special purpose vehicles. The district court resolved the issue in Western's favor on the basis of the record created at trial. The Government now argues that the district court erred in failing to hold a hearing on the matter.

We are hard pressed to see how the district court abused its discretion. Fed.R. Civ.P. 49(a) allows the district court to make a finding on an issue omitted from special interrogatories submitted to the jury if no party has demanded the inclusion of that issue in the jury verdict. The Government did not request amplification of the special interrogatories to identify the fifth wheel-equipped vehicles as an independent category. It does not argue that the district court misapprehended the controlling legal standard, and it conceded at oral argument that adequate evidence had been presented to the jury to have enabled it, if asked, to return a verdict on the issue. All considerations pertinent to resolution of the dispute were before the court. The Government has not shown that the decisional process was significantly impaired by the district court's refusal to grant a hearing. The district court was well within its discretion in choosing not to reopen proceedings for further argument and additional evidence. *NLRB v. Jacob E. Decker & Sons,* 569 F.2d 357, 363 (5th Cir.1978).

### IV.

The district court's judgment in favor of Western for the taxing period 1977 is reversed and the case remanded for entry of judgment in favor of the Government for the taxing period 1977, in accordance with the jury's verdict under Special Interrogatory 2. The district court's refusal to hold a hearing on the post-verdict dispute is affirmed as a proper exercise of discretion.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.