United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 28, 2004**

Charles R. Fulbruge III
Clerk

In the
# United States Court of Appeals
## for the Fifth Circuit

---

m 04-40060
Summary Calendar

---

FALLON T. GORDON, MEDICAL DOCTOR;
JOHN T. HUMBLE, MEDICAL DOCTOR,

> Plaintiffs-
> Counter Defendants-
> Appellees,

VERSUS

SOUTHTRUST BANK,

> Defendant-
> Counter Claimant-
> Appellant.

---

Appeal from the United States District Court
for the Eastern District of Texas
m 1:02-CV-657

---

Before SMITH, DEMOSS, and STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge.[*]

SouthTrust Bank appeals an adverse judgment in a breach of contract suit. The bank also appeals the denial of its renewed motion for judgment as a matter of law ("j.m.l.") or for new trial. We affirm.

## I.

In 1997, plaintiff Drs. Fallon Gordon and John Humble decided to invest in a corporation that purported to be building a hospital, Las Lomas Medical Center, S.A. de C.V. ("Las Lomas"), in Honduras. Armando Moncada, a physician with whom both doctors worked, represented to them that he was the president of the corporation and that Humble and Gordon, as investors, were directors. Before November 1998, Humble had already invested nearly $420,000, and Gordon $300,000, entitling them to three- and four-percent shares, respectively. In October 1998, Humble and Gordon were informed that hurricane Mitch had destroyed substantial parts of the center, and Las Lomas needed approximately $2,000,000 to complete construction.

In November of that year, Humble and Gordon executed individual promissory notes to the bank (then operating as First Bank & Trust) for $400,000 each. The loan Contracts were signed by plaintiffs under unusual circumstances. On November 18, 1998, Humble received a telephone call requesting that he go to the bank to sign loan documents for what he believed was a loan to the corporation. Upon his arrival, however, he was surprised to learn that he was signing papers for a personal loan. Pressed for time and on his way to a medical conference in New York, Humble decided to sign the paperwork, get the check upon his return, and then decide whether to lend the $400,000 to Las Lomas or return the check.

Two days later, Gordon was informed between surgeries that an emergency at the bank required his immediate presence. Under the impression that his signature, as a director of the corporation, was needed to sign a loan, he went to the bank. He too was surprised to learn that the loan was for him personally rather than for the corporation. Unable to reach the executive vice president of the bank, Steve Gantham, Gordon contacted Moncada, who assured him the loan was not personal, but corporate. Reluctantly, Gordon signed the paperwork, figuring that if it did turn out to be a personal loan, he would simply return the money once he received the check.

Both Contracts consisted of a Promissory Note, Disbursement Instructions, and a Disclaimer of Oral Agreements. Both notes stipulated that, "for the value received, Borrower promises to pay to the order of Lender . . . the principal amount [$400,000] . . . plus interest on the unpaid principal balance at the rate and in the manner described below." Pursuant to these notes, both plaintiffs agreed to make twenty-four monthly payments of interest on the principal. At the end of the twenty-four month term, each was to begin making thirty-five monthly payments on the principal, amounting to approximately $12,506.63 each, including interest.

A merger clause was included in the Promissory Note, and the Disclaimer provided that

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

no prior, contemporaneous, or subsequent oral agreements could modify the obligations of the Contract. The Disbursement Instructions provided, respecting the obligation of the bank "to disburse" proceeds of the Promissory Note in the form of a cashier's check "in the following manner: PROCEEDS PAID DIRECTLY TO CUSTOMER $400,000.00." Each Contract identified Gordon and Humble as the "customer," respectively.

The bank issued cashier's checks in the loan amount to each plaintiff. The bank's loan secretary, Graff, made those funds payable to Moncada and deposited them in his business account. The bank issued a check payable to Las Lomas (with Moncada as the remitter) for $1,900,000, combining Gordon's and Humble's loan proceeds with the loan proceeds of five other doctors. The check was deposited into Las Lomas's account at Banco Atlantida in Tegucigalpa, Honduras, on November 23, 1998.

Confused by these developments, Gordon contacted Moncada, who continued to maintain that the loans were for the corporation. Because, however, the corporation was unable to make the interest payments on these loans, Moncada requested that Gordon make the first month's interest payment. Gordon did so.

Humble, on the other hand, was assured by Moncada that the interest notice was a mistake, so Humble did not make the first month's payment, and the interest was paid by the corporation. When Humble received notice for an interest payment in the second month, Moncada successfully convinced him to make payments for the corporation for the remainder of the year, claiming Las Lomas could not afford to do so.

Gordon received no notice for interest in the second month and was assured by Moncada that the corporation would pay it. But, in the third month, Gordon was asked by Moncada to resume payments on the interest, maintaining that all the money had been spent building the hospital and that the corporation would not be able to make payments until the hospital opened and began to generate cash flow.

By late summer 1999, Humble and Gordon were growing wary of Moncada. In October 1999, while attending a stockholders' meeting in Honduras, both doctors learned that their stock was worthless under Honduran law. Distressed, they tried to salvage their investment and create a modern, American-style hospital for the country. They continued to make interest payments on the loan from the bank while attempting, along with the other shareholders, to salvage the project.

By spring 2001, the bank (which had been wholly purchased by SouthTrust Bank in the Fall of 1999) began demanding that Gordon and Humble begin to pay on the principal or to enter into other terms for extension. Ultimately, in hopes of avoiding a legal dispute, both men entered into Extension Agreements and subsequently entered into a second, and even a third, each. They contend that each Extension Agreement contained a provision allowing them to sue on the ground that they had never received the $400,000.[1] Pursuant to

---

[1] The last of the three Extension Agreements reads, in pertinent part, that ". . . execution of this Extension by "Borrower" does not and shall not compromise, diminish, waive, or release "Borrower's" alleged defenses to such claim, including but not limited to, the defense that "Borrower" never (continued...)

3

the final two Extension Agreements, both were obligated to make their first principal payments of approximately $12,168.77 each, including interest, in August 2002. Neither made these payments, and the bank declared the Promissory Notes in default.

## II.

Humble and Gordon sued for a declaratory judgment that they are not liable under the Promissory Notes because of want of consideration. They also sued for breach of contract for the failure to disburse $400,000 each to them pursuant to the terms of the Contract. The bank counterclaimed, seeking money damages under the Promissory Notes.

The bank unsuccessfully moved for summary judgment, and the suit proceeded to trial. The bank's motion for judgment as a matter of law ("j.m.l.") at the close of plaintiffs' case was denied. The jury found that the bank had breached the Contracts, and plaintiffs were awarded the amount of interest payments made by each between December 1998 and July 2002. Plaintiffs were granted reasonable attorneys' fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001, and prejudgment and post-judgment interest of 6% and 1.36%, respectively.

## III.

We review the district court's legal conclusions, including its interpretation of contracts, *de novo*. *See Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001). We apply a sufficiency of the evidence standard in reviewing jury decisions. *See Chem. Distribs., Inc. v. Exxon Corp.*, 1 F.3d 1478, 1483 (5th Cir. 1993). The verdict must

be upheld unless the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary. *W. Co. of N. Am. v. United States,* 699 F.2d 264, 276 (5th Cir. 1983).

## IV.

The bank appeals the final judgment and the denial of the motion for j.m.l. We affirm.

## A.

Ambiguity in a contract is a question of law for the court to decide by looking at the contract as a whole, in light of the circumstances present when the contract was entered. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). If the contract is found to be ambiguous, its interpretation is left to the jury. *Id.* Having determined that the Contracts were internally inconsistent, the district court found as a matter of law that the Contracts were ambiguous and submitted the cause to the jury.

The dispute is whether the bank breached the Contracts' provision for disbursement. The bank maintains that the Promissory Notes were executed appropriately, that the Contracts were not breached, and *ipso facto*, that plaintiffs owe the bank monetary damages for recovery on the principal. Plaintiffs claim there was no such oral agreement and that the terms of the Contracts required that the loans be paid directly to them. As a result, plaintiffs argue that the Contracts were materially breached by the bank, absolving them of liability.

Finding no error of law with respect to the district court's decision to declare the contract ambiguous, we proceed to a review of the jury's findings. There is sufficient evidence to support the finding that the bank breached the

[1](...continued)
received the proceeds reflected in the Note . . . ."

4

terms of its agreements with Gordon and Humble with respect to its disbursement of the checks.

Firstly, read alone, the terms of the Contracts support the jury's finding. The plain meaning of the Contracts best supports the interpretation accorded to them by the plaintiffs. The Disbursement Instructions provide that "Borrower hereby instructs Lender to disburse the initial or complete proceeds from the Promissory Note in the following manner: PROCEEDS PAID DIRECTLY TO CUSTOMER $400,000." "To disburse" suggests something to be done in the future, and evidence at trial suggested that neither Humble nor Gordon had received the loans when the Notes were signed. Payment "directly to customer" further indicates that the checks were to be made out to Humble and Gordon, respectively.

Although the checks were indeed made out to plaintiffs, instead of being given directly to them, they were deposited into Moncada's business account. Evidence indicates, therefore, that neither Gordon nor Humble was ever in direct control of the loan, and they had not been "paid directly."

The bank argues that this arrangement was per an oral agreement made by the parties at an earlier date. The merger clause and Disclaimer of Oral Agreements in each of the Contracts represent, however, that the entirety of the agreements consisted of the Promissory Notes themselves. In fact, the Disclaimer explicitly notes "THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES." Reading the Contracts in their plainest meaning supports the jury's finding that the bank's disbursal of the funds to Moncada constituted an unauthorized con-

version of plaintiffs' funds and was in breach of the Contracts.

Secondly, there was sufficient evidence for a jury to find that there was no oral agreement that clarified the "ambiguous" terms of disbursal. The district court, in ruling the Contracts to be ambiguous, found that the alleged oral agreement did not, as a matter of law, necessarily contradict the terms of the Contracts, because the Disbursement Instruction was so vague as to encompass both sides' interpretations. Because the alleged oral agreement did not contradict the plain meaning of the Contracts, it could not automatically be excluded under the Disclaimers of Oral Agreement signed by both sides.

Relying on testimony, the jury found that the bank's version lacked credibility. Grantham's testimony at deposition and at trial contained enough inconsistencies that a jury might easily find the existence of an oral agreement incredible. Moreover, Grantham's testimony conflicts in several important respects with Graff's, casting further shadow on the bank's claim. Additionally, Humble, Gordon, and even Moncada flatly stated that no such oral agreement existed, and the bank was unable successfully to impeach that testimony.

Thirdly, the bank's behavior contradicted its own internal policies. A reasonable jury could very well be disturbed by the bank's process. Neither Gordon nor Humble had done business with the bank before, and neither owned accounts there. Neither requested a personal loan, and both were called in on "emergencies" and asked to sign the papers in a rush. Neither was informed that the checks would be made out to him but then directly signed over to Moncada and deposited into his corporate account. Grantham's deposition

5

testimony amounts to a virtual admission of the bank's failure to comport with its own policies regarding disbursal, and the evidence is sufficient for the jury to have found that the bank acted inappropriately.

Finally, the terms of the Extension Agreements do not preclude the jury's findings in light of partial performance on the part of the plaintiffs. Partial performance is an exception to the statute of frauds whereby an oral agreement may be enforced if a failure to do so would amount to virtual fraud. *Exxon Corp. v. Breezevale Ltd.* 82 S.W.3d 429, 439 (Tex. App.SSDallas 2002, pet. ref'd). For partial performance to prove contractual obligation, the alleged performance must be "unequivocally referable to the agreement and corroborative of the fact that a contract was actually made." *Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 436 (5th Cir. 2001).

With respect to the preservation of plaintiffs' claims, the jury analyzed the Extension Agreement signed by the doctors and quite reasonably concluded that it was written to preserve all of their defenses to the bank's claims, including their right to sue for breach of contract. Plaintiffs never acknowledge receipt of money or the fulfillment of the Contracts. Especially noteworthy is their insistence that the term "Borrowers" be placed in quotation marks in the Extension Agreements. The Extension Agreements, in explicitly stating that they waived none of their rights, do not constitute adequate evidence that plaintiffs assumed their contractual duties by undertaking these new agreements.

The doctors' regular monthly payments on the interest cannot be considered to bind them to the terms of the Contracts, because no action on the part of the doctors during that period of time is demonstrative of a waiver of their claim. Evidence that they continued to make those payments based on Moncada's misrepresentations and a desire to avoid costly litigation is sufficient to support the jury's finding that interest payments did not bar plaintiffs' cause.

### B.

Under Texas law, "reasonable attorneys fees from an individual or corporation, in addition to the amount of a valid claim and costs, may be awarded if the claim is for . . . (8) an oral or written contract." TEX. CIV. PRAC. & REM. CODE § 38.001. To recover, the party (1) must be represented by an attorney; (2) must present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) must not have received payment for the just amount owed before expiration of the thirtieth day after the claim is presented. § 38.002.

The bank argues that plaintiffs are not entitled to attorney's fees because they did not seek affirmative relief in enforcement of the Contracts.[2] This flatly contradicts court records. Plaintiffs' original petition contains two causes of action: a declaratory judgment and, if the Contracts are ruled enforceable, a breach of contract claim seeking damages. With the delaratory judgment denied, plaintiffs instead brought a breach of contract suit. Therefore, as claimants in a suit in law rather than in equity, they are eligible for attorney's fees.

---

[2] To recover attorney's fees under § 38.001, a party who seeks only to defend itself against another's contract claim cannot recover. *See Energen Res. MAQ, Inc v. Dalbosco*, 23 S.W.3d 551, 558 (Tex. App.SSHouston [1st Dist.] 2001, pet. denied).

The bank also contests plaintiff's presentment of the claim within thirty days. Adequate presentment for plaintiffs' monetary claims can be found in the Extension and Amendment Agreements. A demand letter sent to the bank dated June 3, 2003, also presents the claim for fees. Both these claims were presented within the thirty days before trial established by § 38.0001. Thus, as a matter of law, plaintiffs were eligible for relief under § 38.001.

Mindful that it is within the district court's discretion to award attorney's fees, we may review the reasonableness of those fees. *B-M-G Inv. Co. v. Continental/Moss Gordin, Inc.*, 437 F.2d 892, 893 (5th Cir. 1971). The standard of review is abuse of discretion. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717 (5th Cir. 1974). In determining reasonableness, a court should, among other factors, consider the customary fee for similar work in the community. *Id.* at 718. Two primary attorneys represented plaintiffs, one charging $240 per hour and the other $175. Evidence was presented that plaintiffs' choice of lawyers was appropriate, given the difficulty of the case. The district court, after hearing extensive testimony and with years of experience, determined that reasonable fees would be $200 and $175 per hour, respectively. Both these fees are *lower* than that suggested by a prominent and well-respected local lawyer, who testified that $225 was reasonable. There is no evidence to suggest that the court acted inappropriately in awarding fees.

## C.

There also is sufficient evidence to support the award of prejudgment interest.[3] The dis

trict court was correct in finding that interest began to accrue on the date the lawsuit was filed, rather than on October 21, 2002 (when the bank claims it first became aware of the breach of contract claim), because the original petition includes the claim as well as the request for declaratory judgment. The award was not excessive.

## D.

The bank contends that its substantive right to a trial on all the issues was abridged by the exclusion of testimony and evidence regarding plaintiffs' separate trial against Moncada. We review evidentiary rulings for abuse of discretion. *See In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986). The district court did not abuse its discretion in excluding the evidence, because the bank was given a jury trial on all the issues. The trial against Moncada regarded different issues, although it arose from the same set of circumstances and facts. Plaintiffs' claims against Moncada dealt with his allegedly fraudulent actions regarding the stock that was sold to the doctors and not regarding the loans to plaintiffs.

AFFIRMED.

---

[3] Contrary to the opinion of the bank's counsel, we review prejudgment interest for abuse of discretion, not *de novo*. *See Reyes-Mata v. IBP, Inc.*, 299 F.3d 504, 507 (5th Cir. 2002).