United States Court of Appeals,

Fifth Circuit.

No. 92-3709.

CHEMICAL DISTRIBUTORS, INC., Plaintiff-Appellee,

v.

EXXON CORPORATION, Defendant-Appellant.

Sept. 22, 1993.

Appeal from the United States District Court for the Middle District of Louisiana.

Before POLITZ, Chief Judge, REYNALDO G. GARZA and JOLLY, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Exxon Corporation appeals a final judgment of the district court awarding Chemical Distributors, Inc. ("CDI") damages, attorneys' fees and court costs for breach of contract and violations of the Louisiana Unfair Trade Practices and Consumer Protection Law, La.Rev.Stat.Ann. §§ 51:1401-:1418. ("LUTPA"). We find that the magistrate judge judge did not err in allowing the jury to construe the contract or in sending CDI's unfair trade practices claim to the jury. However, we find the jury's damage award excessive and order a new trial on damages, unless Chemical Distributors, Inc. accepts the remittitur of damages.

I. Background

In November of 1986, CDI and Exxon Chemical entered into a contract for the purchase, sale, delivery, and storage of a soap used by commercial and industrial customers as cleaning solutions and degreasers. Johnson Wax manufactured this commercial cleaner. CDI was Johnson Wax's exclusive distributor for a thirteen-parish area in Southern Louisiana, including the industrial corridor along the Mississippi River between Baton Rouge and New Orleans.

CDI agreed to purchase and sell to Exxon as many products from Johnson Wax as Exxon ordered. Exxon would then fill orders from certain designated accounts. The principal product under the contract was a diluted version of Johnson Wax's heavy-duty water-based cleaner, labeled "J-SHOP 1000." The contract required CDI to dilute the J-SHOP 1000 and re-label the product as

Exxon's "COREXIT-250" cleaner[1] before CDI made sales and deliveries to the designated accounts.[2]

The contract between Exxon and CDI consists of two documents. The first document is a three-page blanket purchase order dated November 11, 1986. The second is a three-page letter agreement dated November 19, 1986. The blanket purchase order estimated Exxon's requirement as 500,000 gallons of cleaner per year. The purchase order permitted Exxon to purchase equivalent products from others, but CDI had the right to match any price offered by a third party. If CDI could not match the price, amounts purchased by Exxon from third parties would be deducted from quantities covered by the purchase order. The purchase order expressly incorporated the letter agreement, stating that the terms and conditions of "said contract" prevailed over any differences from the blanket purchase order.

Exxon bought only 38,000 gallons of cleaner during the first year of contract. On November 17, 1987, one year after entering into the contract, Exxon sent CDI its notice of termination and ceased placing orders for cleaner. According to Exxon, it terminated the contract because CDI had consistently failed to pay its Johnson Wax invoices, had only thirty gallons of cleaner left, and was no longer able to obtain any cleaner from Johnson Wax to supply Exxon's designated account. According to the contract, either party could terminate upon sixty-days' written notice. CDI then initiated suit against Exxon, claiming breach of contract and violation of the Louisiana Unfair Trade Practice Act.

CDI sued Exxon in state court, and Exxon removed to federal court; both parties agreed to trial by jury before a magistrate judge. The jury found Exxon liable for a bad faith breach of contract and for unfair trade practices and awarded CDI $900,000 in damages. The magistrate judge also awarded CDI $345,145.46 in pre-judgment interest, $106,843 in attorneys' fees, and $12,042.94 in costs. Exxon filed motions for judgment notwithstanding the verdict, or alternatively for a new trial, or for a remittitur. Exxon also sought to have the judgment amended to exclude pre-judgment

---

[1]Johnson Wax approved this process.

[2]The two accounts initially designated in the contract were Exxon's Baton Rouge Refinery and Exxon's Baton Rouge Chemical Plant.

interest.  The magistrate judge denied all motions.  Exxon obtained a stay of judgment by posting a supersedeas bond, and now appeals.

## II. Analysis

Exxon claims the magistrate judge erred in:  (1) allowing the jury to construe its contract with CDI;  (2) sending CDI's unfair trade practices claim to the jury;  and (3) upholding the jury's damage award.

We find that the magistrate judge did not err in allowing the jury to construe the contract or in sending CDI's unfair trade practices claim to the jury.  However, we find the jury's damage award excessive and order a new trial on damages, unless CDI accepts the remittitur of damages.

A. *Did the magistrate judge err in allowing the jury to construe the contract?*

Exxon claims the magistrate judge erred in finding the contract ambiguous and in submitting it to the jury for resolution.  Exxon argues that their contract with CDI is susceptible to only one reasonable interpretation;  hence, the magistrate judge should have found it unambiguous and construed it as a matter of law.

Both the letter agreement and the blanket purchase order state that Texas law applies to the contract.  "Texas law has long accepted the rule that the question of whether a contract is ambiguous is a question of law for the court."  *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980).  We review questions of law *de novo.  Jhaver v. Zapata Off-Shore Co.,* 903 F.2d 381, 383 (5th Cir.1990).  Under Texas law, a contract is ambiguous only when the application of pertinent rules of construction leave it genuinely uncertain which one of two reasonable meanings is the proper one.  *Temple-Inland Forest Prods Corp. v. United States,* 988 F.2d 1418, 1421 (5th Cir.1993) (*quoting Prairie Producing Co. v. Schlachter,* 786 S.W.2d 409, 413 (Tex.App.—Texarkana 1990, writ denied)).

### 1. *Who was the "buyer"?*

The first ambiguity the magistrate judge found in the contract concerned the identity of the "buyer."  The magistrate judge noted that the purchase order identified the "buyer" as Exxon Chemical Company, a division of Exxon Corporation.  The blanket purchase order, however, states

that all of the terms and conditions on the reverse of the form are included in the purchase order. On the reverse of the form the term "buyer" includes Exxon Corporation, its divisions, subsidiaries, and affiliates. The magistrate judge found that CDI thought the two initial customer accounts were just that, initial accounts, and that other customer accounts would be added as Exxon's sales staff marketed cleaner to other Exxon divisions and subsidiaries. Exxon, however, thought the contract stated that only Exxon Chemical was the buyer and not Exxon Corporation or any of its divisions.

Therefore, the magistrate judge concluded that "it was for the jury to determine whether the parties contemplated only purchases being made by Exxon Chemical for the two designated customer accounts, or expected the contract to include all of Exxon Corporation's divisions and subsidiaries as purchasers."

2. *Was Exxon required to purchase 500,000 gallons of cleaner per year?*

The second ambiguity the magistrate judge found in the contract turned on whether Exxon was required to purchase 500,000 gallons of cleaner per year as estimated in the blanket purchase order. The magistrate judge again referred to the printed terms on the reverse side of the blanket purchase order. It states in pertinent part:

> If [CDI] delays shipment or completion of shipment for more than thirty (30) days ..., [Exxon] may obtain substitute quantities of the goods from other sources; and the quantities obtained by [Exxon] shall be deducted from the amount [Exxon] is obligated to purchase under this order.

The magistrate judge reasoned that if the purchase order did not require Exxon to make any purchases, this condition made no sense. "The condition is only meaningful if the purchase order is construed to require purchases of about 500,000 gallons per year. Therefore, the 500,000-gallon estimate is another area of ambiguity in the contract."

Exxon argues that their contract with CDI cannot be reasonably construed to require Exxon Chemical to buy 500,000 gallons of cleaner each year. Exxon claims that because of the integration clause found in the blanket purchase order, the letter agreement controls. That clause states, "[t]erms and conditions of said contract [*i.e.,* the letter agreement] are to prevail over any differences from this blanket purchase order." Exxon argues that the letter agreement, the controlling document, does not require Exxon Chemical to purchase any specific amount of cleaner from CDI.

Exxon argues that the pertinent part of the letter agreement reads as follows, "CDI agrees to make available to designated accounts surfactant product(s) as may be ordered by Exxon Chemical under the terms provided herein." Exxon claims that this language does not obligate Exxon Chemical to purchase any specific amount of cleaner.

Exxon further argues that the blanket purchase order imposes no greater obligations on Exxon Chemical to buy cleaner than does the letter agreement. Exxon points out that the purchase order contained a retroactive pricing provision. At the end of the year, Exxon's price for cleaner would be adjusted depending on the amount of cleaner it purchased. The provision begins with the category "0-250,000 gallons/year"; according to Exxon, this proves that both Exxon and CDI knew that sales could be as little as 0-250,000 gallons.

Finally, Exxon argues that even if this is a traditional requirements contract, only the analysis would change but the result would be the same.[3] Exxon argues that a requirements contract imposes a duty of good faith and fair dealing on the parties, but that failure to follow this duty does not state an independent cause of action. Exxon argues that CDI is seeking to "enlarge" its own rights under the contract and require Exxon to do something the contract does not require. According to Exxon, at most, it only had to try in good faith to sell cleaner to the designated accounts.

In contrast, CDI argues that the blanket purchase order was a requirements contract that required Exxon to purchase an estimated 500,000 gallons each year. CDI refers to the portion of the purchase order which states

> Exxon Chemical Company ... agrees to purchase and [CDI] ... agrees to sell and supply such of [Exxon's] estimated requirements of products listed below, as may be ordered from [CDI] during the term of this Agreement, under the terms and conditions set forth herein.

CDI argues that if the contract does not obligate Exxon to purchase its requirements of cleaner from CDI, then it is completely illusory and unenforceable by either party.

CDI further argues that the parties' estimate of the buyer's requirements under a requirements contract has legal significance. CDI refers to Texas Business and Commercial Code section 2-306,

---

[3]Exxon argues, in a footnote, that there are "compelling" reasons to find that the contract is not a requirements contract; Exxon, however, does not state what these compelling reasons are.

which provides,

> a term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

CDI next addresses Exxon's argument that the integration clause in the letter agreement nullifies any "different" requirements found in the purchase order. CDI argues that Exxon's argument is predicated on the flawed assumption that additional obligations contained in the purchase order are necessarily "different" from the obligations stated in the market agreement. CDI asserts that the fact that the purchase order contained an estimate, whereas the letter agreement did not, does not render the terms "different."

The magistrate judge correctly found the contract between Exxon and CDI susceptible to more than one reasonable interpretation. Therefore, he properly had the jury resolve whether the contract: (1) imposed a duty on Exxon to provide additional customer accounts; and (2) obligated Exxon to purchase 500,000 gallons each year.[4]

B. *Was there sufficient evidence to support the jury's verdict regarding the breach of contract claims?*

The jury not only found that Exxon breached the contract, it found that Exxon did so in bad faith. The standard for appellate review of a jury's verdict is exacting. It is the same as the common law standard applied in awarding a directed verdict or a judgment notwithstanding the verdict and is usually referred to as a "sufficiency of the evidence" standard. *See Granberry v. O'Barr,* 866 F.2d 112, 113 (5th Cir.1988).

The verdict must be upheld unless the facts and inferences point so strongly and

---

[4]Exxon also argues that no reasonable person could conclude that Exxon Chemical failed to comply with its marketing obligations under the contract. Exxon's argument is meritless. The magistrate correctly found the contract silent with regard to Exxon's marketing responsibilities; therefore, Exxon's obligations were merely those imposed by Texas state law.

Furthermore, Exxon argues that no reasonable person could conclude that Exxon Chemical failed to comply with the termination provision in the contract or that it terminated the contract prematurely. Again, Exxon's argument is meritless. The magistrate correctly found that since the blanket purchase order did not contain a specific termination clause, the termination clause in the letter agreement controlled.

overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary. If there is evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the jury function may not be invaded.

*Id.* (quoting *Western Co. of N. Am. v. United States,* 699 F.2d 264, 276 (5th Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983)).

The evidence shows that Exxon purchased only 38,000 gallons of cleaner during the first year of the contract. Exxon offered evidence to explain the amount of cleaner it purchased. Exxon claimed that it was necessary to first get environmental approval for the cleaner and that this did not occur until March 1987. CDI, however, offered testimony that before the contract was executed, Exxon did not tell CDI that environmental approval was necessary. Exxon did not purchase any cleaner during the second or third year because it had already terminated the contract.

The contract provided for 60 days notice before termination. At trial, Exxon took the position that it properly terminated the contract. Exxon sent CDI a letter dated November 18, 1987, stating, "Exxon Chemical Company hereby terminates its November 19, 1986 agreement and Blanket Purchase Order with Chemical Distributors, Inc., effective sixty days from the date you receive this letter." CDI introduced evidence that Exxon in fact terminated the contract the same day it sent notice. Two CDI employees testified that on November 19, 1987, they tried to go onto an Exxon plant site where CDI on-site storage tanks were located, but were refused admittance.

Exxon offered testimony to explain their decision to bar CDI's employees from the plant site. David Chesire, Exxon Baton Rouge's representative, testified that the on-going dispute between Garry Strawhun and David Peek over the ownership of the on-site storage tanks put Exxon in an awkward position.[5] Peek had notified Chesire that he held a chattel mortgage on the tanks, as well as, an assignment of CDI's accounts receivable. According to Chesire, Exxon did not want to do anything that might have been construed as interfering with ownership interests either party might have in the tanks.

There was also testimony that prior to November 19, 1987, Exxon had ordered directly from

---

[5]Strawhun was CDI's president and Peek was an investor in CDI.

Johnson Wax a truckload of J-Shop 1000 and had it delivered to Exxon's Baytown, Texas facility. From there it was shipped to Baton Rouge for distribution to Exxon's customer accounts. This occurred prior to January 18, 1988, which would have been approximately 60 days from when CDI received notice of Exxon's termination.

Furthermore, evidence was offered to show that Exxon attempted to negotiate directly with Johnson Wax for the purchase of the same products covered by its contract with CDI. Billy J. Biddy, the Johnson Wax representative who dealt with CDI and Exxon in 1986 and 1987, met with a representative of Exxon Chemical in Baytown, Texas on December 23, 1986. Following that meeting, Johnson Wax shipped 30 gallons of J-Shop 1000 concentrate to Exxon's Baytown, Texas, facility. Biddy planned to follow up on this meeting the week of January 12, 1987, to set up a meeting date to discuss the bulk program in detail.

Biddy compared Exxon's profit potential of purchasing from CDI with directly purchasing from Johnson Wax through the Exxon, Baytown facility. In his view, direct purchases through the Baytown facility would result in larger profit margins for Exxon. Evidence was presented that after Exxon realized the financial advantage of buying directly from Johnson Wax, Exxon also realized that if CDI lost its Johnson Wax distributorship, Exxon would have a free hand in the cleaner market.

By June 22, 1987, a draft agreement between Johnson Wax and Exxon had been prepared and sent to Exxon Chemical, Houston, with comments from Chesire. Biddy's August 1, 1987 monthly activity report states that proposed contracts between Exxon and Johnson Wax had been delivered to Chesire and others at Exxon for their review. This report also states that Biddy had been to Los Angeles demonstrating the cleaner to Exxon refineries located there. Moreover, the report indicates that he was working with Exxon Chemical, Texaco, and another company on marine environment applications of the cleaner. By the end of August 1987, Biddy expected the contract with Exxon, Baytown to be signed within two weeks. Biddy's October 31, 1987 report noted that Exxon, Baton Rouge would be purchasing directly from Johnson Wax.

Finally, evidence was presented that Exxon took advantage of circumstances it did not create

in order to hasten CDI's downfall. When the orders for COREXIT-250[6] did not materialize, CDI began experiencing cash flow problems. Exxon agreed to purchase CDI's on-site equipment, apparently to help CDI's cash flow problems. However, evidence was presented that Exxon actually purchased the on-site equipment because it wanted to obtain the equipment and completely eliminate CDI.

The jury could reasonably conclude on this proof that Exxon not only breached its contract with CDI, but that it did so in bad faith. We, therefore, do not disturb the jury's verdict.

C. *Did the magistrate judge err in submitting CDI's unfair trade practices claim to the jury?*

Exxon asserts that the magistrate judge committed reversible error by submitting CDI's unfair trade practices claim to the jury. Exxon argues that CDI asserts the same facts to support its unfair trade practices claim as it did to support its breach of contract claim. Exxon argues that since CDI's breach of contract claim is deficient as a matter of law, so too, is its unfair trade practices claim.

On the other hand, CDI argues that Exxon intentionally destroyed it through means that included the making of false and misleading statements, conspiring with CDI's supplier to eliminate CDI, refusing in bad faith to pay CDI's invoices, and unlawfully seizing CDI's equipment. CDI points out that Exxon marked up the price of the cleaner by 60¢ per gallon, which was 30¢ per gallon more than CDI's list price. CDI also argues that Exxon and Johnson Wax agreed to a proposed nationwide distribution to capture a share of the industrial cleaner market.

We review motions for judgment notwithstanding the verdict under the test established by *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc). In considering whether there was sufficient evidence to submit this case to the jury, we examine all of the evidence in the light and with all reasonable inferences most favorable to the non-movant. *Id.* at 374. A motion for judgment notwithstanding the verdict is proper only if,

> the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict ... On the other hand, if there is substantial evidence opposed to the motion[ ], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment

---

[6]As stated earlier, CDI's contract with Exxon required CDI to dilute the J-Shop 1000 and re-label it as COREXIT-250.

might reach different conclusions, the motion[ ] should be denied, and the case submitted to the jury.

*Id.*

CDI's unfair trade practice claim is governed by Louisiana law. The Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA) declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are illegal. La.Rev.Stat. § 51:1409. Louisiana has left the determination of what is an "unfair trade practice" to the courts to decide on a case-by-case basis. *Marshall v. Citicorp Mortg., Inc.,* 601 So.2d 669, 670 (La.App.1992). *Bolanos v. Madary,* 609 So.2d 972, 977 (La.App.1992), *writ denied,* 615 So.2d 339 (1993), defined an "unfair trade practice" as one that is "unethical, oppressive, unscrupulous, or substantially injurious." While mere negligence is not prohibited, fraud, misrepresentation, deception, and similar conduct are. *Marshall,* 601 So.2d at 670.

At first glance, the facts of this case are similar to those in *Turner v. Purina Mills, Inc.,* 989 F.2d 1419 (5th Cir.1993). In that case, Turner was a Purina dealer. In the mid-1980s, Turner's sales began to fall, and in 1990 Purina terminated his dealerships. Turner then filed suit against Purina under the Louisiana Unfair Trade Practices Act. Turner introduced evidence to support his argument that Purina was abusive toward its dealers. Turner also introduced an internal Purina memorandum, written after he was terminated, which stated that Purina planned to eliminate his business as a major competitor in the relevant markets. Based on this evidence, the jury returned a verdict in favor of Turner.

On appeal, this court reversed and held that Purina did not violate LUTPA as a matter of law. The court specifically stated that "an intent to eliminate the competition does not by itself violate LUTPA. Rather, the statute forbids businesses to destroy each other through improper *means.*" *Id.* at 1423 (emphasis added).

This case, however, can be distinguished from *Purina* on several grounds. First, in *Purina* the suit was between Turner, the dealer, and Purina Mills, the supplier. Part of the *Purina* decision rests on its analysis of the relationship between a supplier and its dealer. In contrast, this case involves a suit between CDI, a supplier and Exxon, its customer. This case revolves significantly

around Exxon's actions and not those of Johnson Wax. Granted, part of CDI's breach of contract and unfair trade practices claims involve Exxon's direct dealings with CDI's supplier, Johnson Wax. These claims, however, only involve Johnson Wax indirectly.

Second, in *Purina,* the claimant did not have a breach of contract claim, nor did he press one. In this case, the jury not only found that Exxon breached the contract, it found that Exxon did so in bad faith. Third, in *Purina,* there was no fraud, misrepresentation, or deception. In contrast, Exxon's direct dealings with Johnson Wax were at the very least deceptive. Finally, in *Purina,* the internal memorandum promising to eliminate Turner as a major competitor was written only after Purina had cancelled his dealership contract. In this case, however, the internal Johnson Wax memoranda outlining Exxon's direct dealings with Johnson Wax were written before Exxon and Johnson Wax terminated their contracts with CDI.

We find, therefore, that CDI's unfair trade practices claim is not deficient as a matter of law and that it was properly submitted to the jury.

D. *Was there sufficient evidence to support the jury's verdict?*

Finding that CDI's unfair trade practices claim is not deficient as a matter of law, we next review whether sufficient evidence exists to support the jury's verdict in favor of CDI. We apply the same standard outlined above. *See Granberry,* 866 F.2d at 113.

The facts with respect to CDI's LUTPA claim are the same as those that were before the jury on the breach of contract claim. The jury could reasonably conclude, based on the evidence before it, that Exxon acted in an unethical, oppressive, unscrupulous or substantially injurious manner, thereby violating LUTPA. *See Bolanos,* 609 So.2d at 977. We, therefore, do not disturb the jury's verdict.

E. *Did the magistrate judge err in upholding the jury's damage award?*

Exxon argues that the jury's damage award for CDI's lost profits is in error for two reasons. First, Exxon claims that CDI's claim for damages is speculative as a matter of law. Second, Exxon claims that CDI's damage award is excessive since the termination provision in the contract allowed Exxon to terminate upon sixty-days' written notice; therefore, CDI should have been barred from

recovering any damages sustained after the termination. According to Exxon, the record contains no evidence that CDI sustained anywhere close to $900,000 in damages prior to termination.

As to its speculative argument, Exxon notes that the only two people affiliated with CDI who testified at trial about lost profits were Strawhun and Peek. According to Exxon, neither produced any documentary evidence to corroborate his testimony. Exxon argues that this alone requires the damage award to be vacated, since uncorroborated testimony of lost profits is not an adequate substitute for a corporation's extant books and records.

As to its second point, Exxon argues that under no circumstances should CDI recover any damages it allegedly sustained after January 18, 1988, sixty days after the termination notice was given to CDI by Exxon.

CDI, in contrast, argues that the jury's award of damages is supported by the evidence. CDI admits that the testimony of Peek requires certain assumptions of expected future sales volume, but claims it was sufficient to support a jury verdict. CDI further argues that even if Exxon is correct on its contract theory, CDI can still recover its lost profits on account of Exxon's unfair trade practices violation.

It cannot be determined whether the jury's verdict is based on CDI's breach of contract claim, CDI's unfair trade practices claim or a combination of the two. As addressed above, Texas substantive law applies to the breach of contract of claim and Louisiana substantive law applies to the unfair practices claim. Both Texas and Louisiana apply similar standards in reviewing lost profits. Neither state allows damage awards for lost profits that are merely speculative in nature, rather lost profits must be proven with reasonable certainty. *See Fiberlok, Inc. v. LMS Enters., Inc.,* 976 F.2d 958, 962 (5th Cir.1992) (analyzing Texas law); *J.B.N. Morris v. Homco Int'l, Inc.,* 853 F.2d 337, 343 (5th Cir.1988) (analyzing Louisiana law).

As to Exxon's claim that the jury award is excessive,

> before a court of appeals may set aside an award of damages as being excessive, it must make a detailed appraisal of the evidence bearing on damages and find that, in light of such detailed evidence, the amount of the jury's award is so high that it would be a denial of justice to permit it to stand.

*Wood v. Diamond M. Drilling Co.,* 691 F.2d 1165 (5th Cir.1982), *cert. denied,* 460 U.S. 1069, 103

S.Ct. 1523, 75 L.Ed.2d 947 (1983).

A review of the record indicates that Peek did a pro forma analysis of CDI's income and profit potential based on existing sales volumes, anticipated Exxon sales, product costs, overhead, operating expenses, and other costs. Peek's pro forma income statement was admitted into evidence at trial. Peek testified that he included in the revenue calculations CDI's existing 40,000-gallon per year sales of J-Shop 1000, and for 1987 another 41,000 gallons sold through Exxon. For 1988 and 1989, Peek estimated total sales of 540,000 gallons, at $1.80 per gallon, arriving at $972,000 total revenue each year. For each year, Peek deducted the cost of the product, arriving at gross profit figures of $347,000 in 1987, and $405,000 for 1988 and 1989. From the gross profit figures he deducted various expenses and rent. Peek testified, based on his analysis, that CDI would earn profits of $167,000 during 1987 and $225,000 in 1988 and 1989.

Exxon had the opportunity to cross-examine Peek regarding his analysis. Furthermore, Exxon presented testimony through an accountant to challenge Peek's assumptions and calculations. Exxon's accountant questioned whether Peek's calculations should have taken into account repayment of his investment in CDI. Peek, however, testified that he did not anticipate immediate repayment of his investment in CDI.

We find that CDI's lost profits were proven with a reasonable degree of certainty and are not speculative as a matter of either Texas or Louisiana law. However, "[w]hen a jury's award exceeds the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so." *Gough v. Natural Gas Pipeline Co. of America,* 996 F.2d 763, 767 (5th Cir.1993) (*citing Caldarera v. Eastern Airlines, Inc.,* 705 F.2d 778, 784 (5th Cir.1983)).

Even if we assume that Peek's testimony, regarding CDI's lost profits and repayment of his investment is accurate, the most the jury could have reasonably awarded CDI is the sum of lost profits for 1987 through 1989. The sum of lost profits for those years is $617,000. Therefore, we order a new trial on damages unless CDI accepts a remittitur amending the judgment from $900,000 to $617,000, with the district court making the appropriate changes in pre-judgment and post-judgment interest; and court costs and attorneys fees, if needed.

III.

We affirm the district court in all respects except we remand with instruction to grant a new trial on damages only, unless CDI accepts the remittitur we order today.

AFFIRMED in part and REMANDED.