United States Court of Appeals
Fifth Circuit
**F I L E D**

December 5, 2003

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 02-31084
_____

INFUSION RESOURCES, INC. AND
DIABETES RESOURCES, INC.,
d/b/a INSULIN INFUSION SPECIALTIES,

                                        Plaintiffs-Appellants,

                    versus

MINIMED, INC.,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

Before HIGGINBOTHAM, STEWART, and PRADO Circuit Judges.

CARL E. STEWART, Circuit Judge:

Appellants Infusion Resources, Inc. and Diabetes Resources, Inc., d/b/a Insulin Infusion Specialties ("IIS") appeal the decision of the district court granting Appellee Minimed, Inc.'s ("Minimed") motion for summary judgment dismissing IIS's following causes of action: price discrimination claims under the Robinson-Patman Act ("RPA"), 15 U.S.C. § 13(a)/§ 2(a) Clayton Act, and the Louisiana Price Discrimination Act ("LPDA"), La. R.S. § 51:331; a claim for lack of fair dealing under the Louisiana Unfair Trade Practices Act ("LUTPA"), La. § 51:1409; and claims for breach of the implied duty of good faith, breach of contract, defamation and violation of trade secrets.

IIS also appeals the district court's denial of its Fed. R. Civ. P. 59(e) motion for reconsideration. For the reasons that follow, we affirm the judgment of the district court.

FACTUAL AND PROCEDURAL BACKGROUND

Minimed is the world's largest manufacturer of insulin infusion pumps. MiniMed's United States pump therapy market share is approximately 80%. According to MiniMed, between the years 1996 to 2001, users of insulin pumps increased from about 6,000 to about 54,000 nationwide. MiniMed pumps have a list price of $4,995, and a patient may expect to expend over $2,000 per year for the complementary disposable items associated with the pump.

IIS conducted business as an insulin pump distributor and related supplies to end-users for at least two of MiniMed's competitors. In the Fall of 1994, IIS informally became a distributor of MiniMed's pumps. In July 1997, the two parties entered into a formal written Distribution Agreement (the "Agreement"), which provided that California law would govern, granting IIS a non-exclusive right to sell and distribute MiniMed products. The Agreement also bestowed upon IIS the ability to purchase the pumps from MiniMed at the highest available discount, up to 29%, depending on IIS's overall purchase volumes. Additionally, IIS agreed to promote MiniMed and its products and maintain adequate facilities and personnel to do so, as well as provide training to pump purchasers and pay all costs to deliver products to end users. IIS also agreed, with one exception[1], to market MiniMed's products exclusively and that it would not directly or indirectly manufacture,

_____

[1] This exception provided:

> To the extent customers of IIS requested infusion sets not manufactured or distributed by Minimed, IIS may carry such infusion sets to fill orders expressly requested by customers; provided however, that all such infusion sets other than those manufactured by or for MiniMed which are distributed by IIS shall not exceed an aggregate of 20% of all such sets (determined by retail sale price) distributed by IIS in any calender year.

distribute or market products which compete directly or indirectly with products manufactured by MiniMed. The Agreement did not grant IIS an exclusive distributorship and MiniMed was expressly allowed both to sell its products in the territories served by IIS, and to utilize other distributors. The Agreement contained an annual renewal clause, which allowed either party to decline renewal of the Agreement, with or without cause, on thirty days written notice prior to the end of the current calendar year.[2]

The parties operated under the Agreement from July 17, 1997 until December 31, 1998 during which time IIS received a 29% discount off of the list price on MiniMed pumps. On November 23, 1998, MiniMed sent IIS written notice that it was not going to renew the Agreement for the 1999 calender year, and the Agreement terminated on December 31, 1998. MiniMed indicated to IIS that it was willing to continue selling pumps to IIS at the full list price. On January 29, 1999, IIS purchased a single MiniMed pump at the full list price of $4,995 which was shipped from California to Louisiana. IIS submitted unrebutted evidence that between January 1, 1999 and February 4, 1999 MiniMed sold, across state lines, other distributors the same type of pump for $3,996. IIS also submitted an invoice which showed that one of these distributors was a company named "Secure Care", which the district court assumed was Secure Care Medical, an entity named by IIS as a MiniMed distributor in the South.

IIS initiated an action in November, 1998, in which it claimed that MiniMed breached the Agreement by both wrongfully passing IIS confidential and proprietary information to MiniMed salespersons and by making intentional and material misrepresentations to IIS's customers in order

---

[2] IIS's contractual distribution territory per the Agreement included Louisiana, Texas, Arkansas, Ohio, Pennsylvania, New York, Connecticut, New Jersey, Utah, Virginia, North Carolina and Mississippi.

to divert sales from IIS to MiniMed. IIS also complained that MiniMed acquired IIS's two main distribution competitors and unfairly manipulated the wholesale prices at which it sold its products to IIS, in order to hinder IIS's ability to compete with MiniMed or MiniMed-owned distributors.[3] IIS sought damages pursuant to MiniMed's alleged price discrimination, unfair trade practices, breach of contract and implied obligation of good faith , trade secrets violations, defamation, and detrimental reliance. On March 8, 1999, MiniMed timely removed the case and filed a cross motion for summary judgment to dismiss all of IIS's claims, which the district court granted.

IIS now appeals and argues that the district court erred in: (1) dismissing IIS's price discrimination claims by finding that there were no disputed facts regarding whether IIS engaged in actual competition with any favored resellers of MiniMed; (2) dismissing IIS's LUTPA claim; (3) excluding IIS's expert evidence regarding the damages it suffered as a result of MiniMed's conduct; (4) dismissing IIS's breach of contract and implied duty of good faith, defamation and fair dealing claims; (5) denying IIS's 59(e) motion for reconsideration of its order granting MiniMed summary judgment dismissing of all of IIS's claims; and (6) dismissing IIS's price discrimination claims by finding that IIS failed to present evidence of actual injury.

## DISCUSSION

I.    Standard of Review

This Court reviews a district court's grant of summary judgment *de novo*. Am. States Ins. Co. v. Synod of the Russian Orthodox Church Outside of Russia, 335 F.3d 493 (5th Cir. 2003).

---

[3] IIS submitted MiniMed's 1999 10-K report filed with Securities and Exchange Commission which stated that in 1998 MiniMed had acquired two distributors named HMS and DSS. In the report MiniMed allegedly stated "By increasing our ability to satisfy more of our customers' needs and continuing our extensive customer service efforts, we believe we can maximize our revenues over the long term and create barriers to entry for competitors." IIS, however, did not offer any evidence as to what specific geographic areas these two distributors operated in.

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 ©); Tango Transp. v. Healthcare Fin. Servs. LLC, 322 F.3d 888, 890 (5th Cir. 2003). A genuine issue of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. Id. Questions of law are reviewed *de novo*. Id.

II.     Price Discrimination Robinson-Patman Act, 15 U.S.C. § 13(a)/§ 2(a) Clayton Act[4]

In order to recover damages for a claim under §13(a) of the Robinson-Patman Act (RPA)/§2(a) Clayton Act claim, a plaintiff must prove four facts: one, sales made in interstate commerce; two, the commodities sold to IIS were of the same grade and quality as those sold to other purchasers; three, MiniMed discriminated in price between IIS and other purchasers; and four, that the discrimination had a prohibited effect on competition. Lycon Inc. v. Juenke, 250 F.3d 285, 288 (5th Cir.), cert. denied, 122 S. Ct. 209 (2001). RPA §13(a) includes two basic types of injury, primary line and secondary line. Eximco, Inc. v. Trane Co., 737 F.2d 505, 515 (5th Cir.), reh'g granted in part, amended in part on other grounds, 748 F.2d 287 (5th Cir. 1984). Secondary-line injury, which IIS claims to have incurred, results from price discrimination between favored and disfavored buyers. Texaco, Inc. v. Hasbrouck, 496 U.S. 543, 558 n. 15 (1990).

---

[4] Section 2(a) of the Clayton Act, as amended by RPA, 15 U.S.C. § 13(a) provides in pertinent part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States...and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them...

The district court held that while IIS met its burden on elements one and two, it failed to show element three, that MiniMed discriminated in price between IIS and other purchasers, and dismissed IIS's claim at that point. The district court did not reach element four.

Under element three a plaintiff "must first prove that as the disfavored purchaser, it was engaged in actual competition with the favored purchaser(s) as of the time of the price differential" and that this "competitive nexus requirement is satisfied when there is a showing of 'competitive contact' between the recipients of the price differential." Best Brands Beverage, Inc. v. Falstaff Brewing Co., 842 F.2d 578, 584 (2d Cir. 1987). In other words it "must therefore be shown that as of the time the price differential was imposed, the favored and disfavored purchasers competed at the same functional level, i.e., all wholesalers or all retailers, and within the same geographic market." Id. at 585. This Court has explained that "competition is determined by careful analysis of each party's customers. Only if they are each directly after the same dollar are they competing." M.C. Mfg. Co. v. Texas Foundries, Inc., 517 F.2d 1059, 1065 (5th Cir. 1975).

In concluding that IIS failed to satisfy element three, the district court noted that IIS's claim that it was one of MiniMed's top three distributors in the United States and that it was competing nationwide with MiniMed's other distributors, even if true, does not necessarily indicate that the markets of these distributors overlapped. The district court found that IIS did not specifically demonstrate any evidence showing that it directly competed with any of MiniMed's other distributors for "the same dollar" nationwide. The district court noted that while IIS did proffer some evidence that prior to the alleged price discrimination it competed with at least one reseller, Secure Care Medical, in the South, and that an entity named National Diabetes Pharmacy distributed MiniMed products in Virginia, it had not specifically pointed to any evidence that at the time of the alleged

6

price discrimination that it was competing with these entities or any other entity in a particular market.

IIS asserts that the evidence it presented - that before and after January 1, 1999, it competed with other MiniMed distributors for customers - was sufficient to meet its "competitive nexus burden" and preclude the district court's granting of MiniMed's motion to dismiss for IIS's failure to meet element three of its §13(a) RPA claim. IIS also asserts that the district court acknowledged that it submitted evidence that IIS competed with at least one other reseller, Secure Care Medical, in the South. Furthermore, IIS submitted evidence that another entity, National Diabetes Pharmacy, distributed MiniMed pumps IIS's territory of Virginia.

After reviewing the facts on the record and their application to the law, we hold that the district court was correct in its conclusion in regards to element three. The competitive nexus is established if the disfavored purchaser and favored purchaser compete at the same functional level and within the same geographic market at the time of the price discrimination. Best Brands, 842 F.2d at 585. IIS has established that both Secure Care Medical and National Diabetes Pharmacy compete at the same functional level as IIS, i.e., they are all retail sellers of MiniMed's pumps. Additionally, IIS established, at least in respect to National Diabetes Pharmacy, a MiniMed distributor in Virginia, that it operated in the same geographic market because Virginia was one of IIS's contractual territories. IIS, however, has not submitted evidence that either Secure Care Medical or National Diabetes Pharmacy qualified as "favored purchasers" at the time of the alleged price discrimination, when the Agreement with MiniMed was no longer in effect. See M.C. Mfg., 517 F.2d at 1065. Thus, IIS has not shown actual competition with a favored purchaser at the time of the alleged price discrimination and has failed to meet its burden on this element.

III.     Price Discrimination, Louisiana Price Discrimination Act, La. R.S. § 51:331

The district court also dismissed IIS's price discrimination claim under the LPDS, La. R.S. § 51:331 for the same reasons it dismissed the RPA claim, because IIS failed to show actual competition with a favored purchaser at the time of the alleged price discrimination, and thus failed to meet its burden.  The district court also noted that the language of the statute clearly indicated that the Louisiana legislature intended to address discriminatory pricing "in the state" and IIS failed to show any favored distributors it competed with in Louisiana.

IIS's federalism argument in which it contends that even if its federal RPA claim is dismissed it is still entitled to a state claim under the LPDS, La. R.S. § 51:331 is incorrect. IIS bases this argument on its assertion that the district court dismissed IIS's claim under LPDS simply because it found that IIS's federal antitrust claim under the RPA failed.

This is not a correct understanding of the district court's reasoning for dismissing IIS's LPDS claim.  The district court clearly stated that it analyzed IIS's claim under LPDS, and whether IIS established the elements for such claim.  The district court found that the Louisiana legislature intended the statute to address discriminatory pricing "in the state" and  IIS failed to set forth specific evidence that MiniMed had charged IIS a different price than it charged any other pump distributor in Louisiana, at the time of the alleged price discrimination.  Therefore, the district court held that IIS's claim failed.  Our review of the record finds no evidence of IIS competing with any other pump distributor in Louisiana at the time of the alleged price discrimination, and therefore the district court was correct in dismissing IIS price discrimination claim under the LPDS.

IV.     Louisiana Unfair Trade Practices Act, La. § 51:1409

8

The district court found that because MiniMed validly effectuated the non-renewal of the Agreement pursuant to the non-renewal clause, evidence submitted by IIS relating to damages from non-renewal of the Agreement would be excluded. The district court also held that MiniMed was not liable for damages under the LUTPA, La. R.S. § 51:1409, which precludes entitlement to damages for non-renewal of an agreement as well as price discounts, and therefore any such evidence presented by IIS for damages under the LUTPA was irrelevant and must be excluded. Turner v. Purina Mills, Inc., 989 F.2d 1419, 1423-24 (5th Cir. 1993). The district court therefore dismissed IIS's LUTPA claim.

IIS argues that it submitted sufficient evidence in the form of MiniMed memoranda showing that MiniMed violated the LUTPA. These memoranda allegedly contain statements made by MiniMed showing it intended to do harm to IIS in violation of the LUTPA.[5] The district court held that Turner precluded damages pursuant to a LUTPA claim when the damages were tied to either a non-renewal of an agreement or price discounts, as was the case here. See 989 F.2d at 1423-24.[6]

IIS argues that its case is distinguishable from Turner and is more analogous with Chemical Distribs., Inc. v. Exxon Corp., 1 F.3d 1478 (5th Cir. 1993), and notes that this Court distinguished Purina because unlike the claimant in that case, in Exxon, the jury found that Exxon had breached its contract in bad faith, there was sufficient evidence of fraud, misrepresentation, or deception, and there

---

[5]IIS points to the record to show that MiniMed made the following statements in memoranda such as: "pull trigger"; "put IIS on a leash"; and "weaken or destroy them".

[6] In Turner, 989 F.2d at 1420, the plaintiff was a Purina dealer whose agreement was terminated by Purina pursuant to a non-renewal provision after his sales fell. The dealer then brought suit under the LUTPA and introduced into evidence an internal Purina memoranda which stated that Purina planned to eliminate his business as a major competitor in the relevant markets. Id. at 1420-21. This Court held that Purina did not violate the LUTPA since its termination of the contract was valid, and "an intent to eliminate the competition does not by itself violate LUTPA. Rather, the statute forbids businesses to destroy each other through improper *means*." Id. at 1423. Finally, this Court held that the LUTPA does not provide an alternative remedy for simple breaches of contract. Id. at 1422.

9

were internal memoranda prepared before the contracts was terminated. Id. at 1485-86.

This Court in Exxon, however, stated that Exxon differed from Turner in that the latter dealt with a suit between a dealer and a supplier, and part of the decision in that case rested on its analysis of the relationship between the two. Id. at 1485. Exxon, in contrast, dealt with a supplier (the plaintiff) - customer (Exxon) relationship and outlined conduct allegedly perpetrated by Exxon that IIS does not allege of MiniMed in this case. Id. Such conduct by Exxon included: conspiring with the plaintiff's supplier to eliminate the plaintiff, refusing in bad faith to pay plaintiff's invoices, and unlawfully seizing the plaintiff's equipment. Id. This Court in Exxon did not indicate that any part of Turner had been invalidated. Because IIS's case significantly resembles Turner more than it does Exxon, the district court's holding that there were no actionable LUTPA claims was correct.

V.      IIS's damage report and remaining non-antitrust claims

Once the district court found that IIS had failed to establish the required elements for any of its antitrust claims, and dismissed those claims, it held that the February 5, 2002 damage report submitted by IIS became defective as support for its remaining non-antitrust claims because the report failed to segregate between Minimed's allegedly wrongful antitrust and non-antitrust conduct, and the specific damages that flowed from each.[7] The district court then granted IIS leave to file an amended damage report which listed only those damages caused by the non-antitrust conduct. IIS submitted an amended damage report dated May 19, 2002. The district court reviewed the amended report and granted Minimed's motion to strike the report because it held that IIS simply repackaged its original report, which claimed its damages flowed from Minimed's antitrust conduct, to assert that

_____

[7] These remaining claims were (1) detrimental reliance, (2) breach of contract and the implied obligation of good faith and fair dealing under California law, (3) defamation under Louisiana law, and (4) unfair trade practices.

10

essentially the same damages now flowed from the remaining non-antitrust claims.[8] Upon striking the amended damage report the district court also granted Minimed's summary judgment motion to dismiss IIS's remaining non-antitrust claims.

The district court was correct to strike the amended report because it did not properly reflect the true amount of estimated damages which flowed from the remaining non-antitrust claims, making the report seriously flawed and inadmissible. City of Vernon v. S. Cal. Edison Co., 955 F.2d 1361, 1371-73 (9th Cir.), *cert. denied*, 506 U.S. 908 (1992) (affirming summary judgment for defendant because of, *inter alia*, plaintiff's failure to properly prove damages where plaintiff did not attempt to or offer to correct the only possibly admissible damages study).

Furthermore, IIS's argument that the disaggregation rule is only required in antitrust cases, and thus became non-applicable once its antitrust claims were dismissed, is incorrect.[9] This Court has not limited the concept of disaggregation merely to antitrust actions. See, e.g. Perrone v. General Motors Acceptance Corp., 232 F.3d 433 (5th Cir. 2000) (actual damages for violation of the Truth in Lending Act requires direct causal relationship between the amount of damages and injury or harm); National Papaya Co. v. Domain Industries, Inc., 592 F.2d 813, 818 (5th Cir. 1979) (in a

---

[8] IIS's February 5, 2002 expert damage report used a projection of future earnings model to calculate its damages resulting from the change in commercial relationship between MiniMed and IIS. When IIS subsequently submitted its May 19, 2002 amended damage report, it again used the projection of future earnings model, but then attributed the same damages to its remaining non-antitrust claims.

[9] To support this argument IIS cites Spray-Rite Serv. Corp. v. Monsato Co., 684 F.2d 1226, 1243 (7th Cir. 1982), *aff'd*, 465 U.S. 752 (1984); ILC Peripherals Leasing Corp. v. IBM Corp., 458 F. Supp. 423, 434 (N.D. Cal. 1978), *aff'd sub nom.* Memorex Corp. v. IBM Corp., 636 F.2d 1188 (9th Cir. 1980), *cert. denied*, 452 U.S. 972 (1981). However, while these cases do hold that disaggregation generally applies to antitrust claims, none of them held that disaggregation is only required in antitrust cases. Furthermore, Minimed cites to non-antitrust cases held that disaggregation of damages does apply to other than antitrust claims. Fleet Nat'l Bank v. Anchor Media Television, Inc., 45 F.3d 546, 560 (1st Cir. 1995) ("The law...requires that a party prove, as an element of its case, the extent to which it was damaged by the fraud or breach"); Doe v. United States, 976 F.2d 1071, 1085-1086 (7th Cir. 1993)("the trial court did not abuse its discretion in finding that a causal relationship was insufficiently established").

breach of warranty claim the plaintiff has the burden to show that it's lost profit damages flowed as the natural and proximate result of the defendant's wrongful conduct).

Because IIS merely repackaged its original damages report, and submitted it as an amended report to support its remaining non-antitrust claims, the district court was correct to exclude it. Once the amended damages report was excluded, IIS could not show any damages resulting from its remaining non-antitrust claims. Therefore, the district court was correct in dismissing these remaining claims because IIS had failed to submit proper proof of damages.

VI.     Treble damages under § 4 of the Clayton Act

The district court concluded that because IIS had failed to carry its burden against MiniMed's summary judgment motion under element three, it need not address alternative arguments for dismissal. MiniMed argued alternatively that IIS failed to show element four of its § 13(a) RPA claim, that the alleged discrimination prohibitively effected competition, by causing harm to IIS, or that IIS had suffered actual injury under § 2(a) of the Clayton Act for the purpose of establishing entitlement to treble damages pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15.

IIS's argues that all that is necessary to show harm under § 2(a) of the Clayton Act for the purpose of establishing entitlement to treble damages pursuant to § 4 of the Clayton Act is the presence of price discrimination. This is incorrect. The Supreme Court in J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 561 (1981) stated that a showing of price discrimination is sufficient when seeking an injunction under § 2(a), but not when damages are sought. Because IIS has failed to show actual injury, it failed to satisfy element four of its § 13(a) RPA claim, as well as failing to show that it is entitled to treble damages under § 4 of the Clayton Act.

VII.    59(e) Motion to Reconsider

This Court has held that a 59(e) motion to reconsider should not be granted unless:  (1) the facts discovered are of such a nature that they would probably change the outcome; (2) the facts alleged are actually newly discovered and could not have been discovered earlier by proper diligence; and (3) the facts are not merely cumulative or impeaching. See English v. Mattson, 214 F.2d 406, 409 (5th Cir. 1954).   The district court held that IIS failed to meet these requirements.

IIS argues that its 59(e) motion for reconsideration of the district court's decision to grant MinMed summary judgment  should not have been denied because it satisfied the requirements for reconsideration.  Specifically, IIS asserts that it submitted new evidence not available to it at the time the district court granted summary judgment.  The alleged new evidence concerns the names of other MiniMed distributors who sold MiniMed pumps throughout the United States and specifically in certain markets that IIS asserted that it was also competing in.  IIS argues that this information was not available to it in a timely manner through no fault of its own but through MiniMed's refusal to provide such information during discovery until after its summary judgment motions were granted. IIS argues that this new evidence would have satisfied element three of its § 13(a) RPA claim.

While the new evidence submitted by IIS may not have been discoverable prior to the district courts granting of MiniMed's summary judgment motions, the district court found that it would not have changed the outcome.  The district court reasoned that it did not base its summary judgment decision on IIS's failure to show that other distributors competed in certain markets at the time of the alleged price discrimination.  Rather, the district court based its decision on IIS's failure to submit sufficient evidence that it also competed in those particular markets during the relevant period, when its agreement with MiniMed to service particular markets had been terminated as of December 31,

1998. Because we have found that IIS failed to submit proof of competition with a favored purchaser during the time of the alleged price discrimination, the district court's denial of IIS's 59(e) motion for reconsideration was correct.

CONCLUSION

Because IIS failed to submit proof that it competed with favored purchasers in its geographical area at the time of the alleged price discrimination committed by Minimed, failed to submit proper proof of damages, and failed to submit evidence sufficient for a reconsideration of the district court's grant of summary judgment dismissing all of IIS's claims, we affirm the decision of the district court granting Minimed's motion for summary judgment which dismissed all of IIS's claims.

AFFIRM.